**16-1115, -1116, -1842**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

ROMAG FASTENERS, INC.,
*Plaintiff – Cross-Appellant,*

v.

FOSSIL, INC., FOSSIL STORES I, INC., MACY'S, INC.,
MACY'S RETAIL HOLDINGS, INC.,
*Defendants – Appellants,*

DILLARD'S, INC., NORDSTROM, INC., THE BON-TON STORES, INC.,
THE BON-TON DEPARTMENT STORES, INC., BELK, INC.,
ZAPPOS.COM, INC., ZAPPOS RETAIL, INC.,
*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT

10-cv-01827-JBA and 11-cv-00929-CFD

Janet Bond Arterton, United States District Judge

## CORRECTED BRIEF OF PLAINTIFF/APPELLEE/CROSS-APPELLANT
## ROMAG FASTENERS, INC.

Norman H. Zivin
Tonia A. Sayour
COOPER & DUNHAM, LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 278-0400
(212) 391-0525 (fax)
nzivin@cooperdunham.com
tsayour@cooperdunham.com

Jonathan Freiman
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com

*Attorneys for*
*Plaintiff/Appellee/Cross-Appellant*
*Romag Fasteners, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Romag Fasteners, Inc. certifies the following:

1.  The full name of every party represented by us is: Romag Fasteners, Inc.

2.  The name of the real party in interest represented by us is: not applicable.

3.  All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by us are: none.

4.  The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are: <u>Law firms</u>: Brenner, Saltzman & Wallman LLP; Cooper & Dunham, LLP-NY; Wiggin and Dana LLP; <u>Attorneys</u>:  David R. Schaefer, Brian P. Daniels, Sean M. Fisher, Norman H. Zivin, Tonia A Sayour, Adam Farbiarz, Tahlia Townsend, Jonathan M. Freiman.


Dated: June 20, 2016

<div style="margin-left:40%">

By:    <u>/s/ Jonathan M. Freiman  </u>
Jonathan M. Freiman
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com

*Attorneys for Plaintiff/Appellee/Cross-Appellant*
*Romag Fasteners, Inc.*

</div>

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ..................................................................vi

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ....................4

A. Overview of the Facts ...............................................................4

B. Fossil Directs Its Chinese Factories to Use Romag Snaps and Buy Them from Romag's Only Authorized Chinese Manufacturer, Wing Yip .............................7

C. Romag Polices Its Intellectual Property and Learns that Hechuang Is Selling Counterfeit Snaps to Fossil's Chinese Manufacturer, Superior ..........................9

D. Romag Confronts Fossil; Fossil's Manufacturer Informs Fossil It Used Counterfeit Snaps; Romag Sues ........................................................11

E. The Parties' Claim Constructions and Experts' Opinions..................................13

   1. Background on the '126 patent...................................................13

   2. Fossil argues that "rotatable" is an ordinary-language term, then asserts it's indefinite because the patent doesn't disclose a Rotatability "test.".............14

   3. The District Court rules that Fossil's indefiniteness defense is "woefully inadequate" and grants summary judgment on it to Romag .........................15

   4. Fossil's remaining invalidity defenses had grave flaws................................17

   5. Fossil's non-infringement defenses lacked evidence ....................................18

F.  Fossil Finally Admits Its Invalidity Defenses Are a "Waste of Everybody's Time," But Still Won't Withdraw Them Before Trial.................19

G.  At Trial, Reiter Testifies on Validity and Fossil Offers Only a "Phantasmagorical" Story That the Unauthorized Snaps Are Somehow Authentic......................................................................20

H.  Romag Shows Fossil Acted with Callous Disregard for Romag's Rights ................................................................................................22

I.  The Jury Returns a Verdict for Romag and Finds Fossil Acted with "Callous Disregard," Though Not "Willfully ...................24

J.  After a Bench Trial, the Court Reduces Patent Damages and Sets Aside the Entire Award of Trademark Profits....................................25

K.  The District Court Rules This Is an Exceptional Case under the Patent Act and Also Awards Fees under State Law ...........................26

SUMMARY OF THE ARGUMENT ......................................................28

FOSSIL'S APPEAL

I.  The District Court Acted Well Within Its Discretion in Finding This an Exceptional Case ........................................................30

    A.  The District Court Has Wide Discretion In Determining Whether a Case Is Exceptional ..........................................................30

    B.  A District Court's Exceptional Case Finding Is Reviewed Under an Abuse-of-Discretion Standard.........................................31

    C.  The District Court Correctly Assessed the Totality of the Circumstances ....................................................................33

        1.  The District Court acted within its discretion in holding that Fossil's indefiniteness defense bordered on frivolous.............34

a.  Judge Arterton saw Fossil's litigation tactics firsthand, assessed Fossil's motivation in asserting the indefiniteness argument, and considered the frivolity of the argument in finding this an "exceptional case" ........35

b.  Fossil never appealed the summary judgment ruling rejecting its indefiniteness defense—and cannot now collaterally attack it .........................................................37

c.  Fossil never presented to the District Court any of the arguments that it now makes to say its indefiniteness defense was reasonable ................................................38

d.  Fossil's attacks on the summary judgment ruling also lack merit ......................................................................40

i.  Fossil put on all its evidence .....................................41

ii. The District Court accepted Kucklick's factual assertions as true—and irrelevant..............................42

iii. *Mitzi* confirms Fossil's defense had no merit............42

iv. The *Nautilus* standard does not make Fossil's indefiniteness position any more reasonable.............44

v.  Fossil's decision to move for summary judgment on indefiniteness shows how far it pushed its scorched earth tactics, not how reasonable it was ...................46

2.  The District Court didn't clearly err in finding that Fossil didn't withdraw its remaining invalidity defenses until after trial ...................................................................................47

a.  Fossil chose not to withdraw its remaining invalidity defenses .........................................................48

b. Fossil's invalidity defenses—which it later admitted were a "waste of everybody's time"—required Romag to prepare and present evidence of validity and infringement .............................................................50

c. Romag accurately represented the effect of Fossil's failure to withdraw its invalidity defenses until after trial ........................................................................54

3. The District Court correctly determined that considerations of compensation and deterrence support an exceptional case finding .....................................................................................56

4. The District Court acted well within its discretion in weighing Fossil's Non-Willfulness and Romag's laches ........................59

II. The District Court Properly Exercised Its Discretion in Awarding Expert Fees ....................................................................................61

III. The Supplemental Fee Award Properly Reflected Romag's Successful Fee Petition ...................................................................................63

ROMAG'S CROSS APPEAL

I. The Substantive Weakness of Fossil's "Phantasmagorical" Factual Theory Could Alone Have Supported a Finding That This Was an "Exceptional" Case .........................................................................65

II. The *Octane Fitness* Standard Should Have Been Used to Determine Whether This Was an "Exceptional" Case Under the Lanham Act .............67

CONCLUSION AND RELIEF SOUGHT ............................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
    23 F.3d 374 (Fed. Cir. 1994) ............................................................62

*Baker v. DeShong*,
    No.14-11157, 2016 WL 2342963 (5th Cir. May 3, 2016) .................................69

*Beckman Instruments, Inc. v. LKB Produkter AB*,
    892 F.2d 1547 (Fed. Cir. 1989) .........................................................32

*Bridgeport Music, Inc. v. WB Music Corp.*,
    520 F.3d 588 (6th Cir. 2008) ...........................................................57

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
    977 F.2d 1555 (Fed. Cir. 1992) .........................................................56

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1283 (Fed. Cir. 2015),
    *petition for rehearing en banc partly held in abeyance by*
    805 F.3d 1382 (Fed. Cir. 2015) ........................................................54

*Celotex Corp. v. Edwards*,
    514 U.S. 300 (1995) ....................................................................38

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .....................................................................61

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990) ....................................................................35

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
    803 F.3d 620 (Fed. Cir. 2015), *cert. denied*, No.15-1160, 2016 WL
    1059925 (U.S. May 23, 2016) ...........................................................45

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
    809 F.3d 1223 (Fed. Cir. 2015) ........................................................45

*Enmon v. Prospect Capital Corp.*,
    675 F.3d 138 (2d Cir. 2012) ............................................................. 62

*Eon-Net LP v. Flagstar Bancorp*,
    653 F.3d 1314 (Fed. Cir. 2011) ........................................................ 58

*Fair Wind Sailing, Inc. v. Dempster*,
    764 F.3d 303 (3d Cir. 2014) ............................................................. 69

*Fifty Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059, 1078 (9th Cir. 2015) ................................................ 69

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517 (1994) ........................................................... 30, 31, 57

*Georgia-Pac. Consumer Products LP v. von Drehle Corp.*,
    781 F.3d 710 (4th Cir. 2015) ............................................................ 69

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    No.14-1513, 2016 WL 3221515 (U.S. June 13, 2016) ...................... 54

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) ............................................................ 4

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    134 S. Ct. 1744 (2014) ................................................ 31, 32, 35, 36

*Homeland Housewares, LLC v. Sorensen Research*,
    581 F. App'x 877 (Fed. Cir. 2014) ............................................. 32, 36

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
    341 F.3d 1332 (Fed. Cir. 2003) ................................................. 45, 46

*Hormel v. Helvering*,
    312 U.S. 552 (1941) ................................................................. 39, 40

*HTC Corp. v. IPCom GmbH & Co., KG*,
    667 F.3d 1270 (Fed. Cir. 2012) ........................................................ 40

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    568 U.S. ___, No.15-375, slip op. at 7 (June 16, 2016) ............. *passim*

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
   811 F.3d 479 (Fed. Cir. 2016) ....................................................................31, 66

*Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*,
   515 F.3d 1331* (Fed. Cir. 2008) ...............................................................43

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
   726 F.3d 1359 (Fed. Cir. 2013) ..............................................................4, 56, 58

*Motorola, Inc. v. Interdigital Tech. Corp.*,
   121 F.3d 1461 (Fed. Cir. 1997) ...............................................................50, 56

*Nan Ya Plastics Corp. v. United States*,
   810 F.3d 1333 (Fed. Cir. 2016) ..............................................................38

*Nat'l Wildlife Fed'n v. Burford*,
   835 F.2d 305 (D.C. Cir. 1987).................................................................40

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014)................................................................*passim*

*Nilssen v. Osram Sylvania, Inc.*,
   528 F.3d 1352 (Fed. Cir. 2008) ...............................................................55

*Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant*,
   771 F.2d 521 (D.C. Cir. 1985)..................................................................68, 69

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
   467 F.3d 1355 (Fed. Cir. 2006) ...............................................................66

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014)................................................................*passim*

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
   806 F.2d 1565 (Fed. Cir. 1986) ...............................................................44

*Penshurst Trading Inc. v. Zodax LP*,
   No.14-CV-2710 RJS, 2015 WL 4716344 (S.D.N.Y. Aug. 7, 2015)................68

*Rentrop v. Spectranetics Corp.*,
   550 F.3d 1112 (Fed. Cir. 2008) ...............................................................39

*Revson v. Cinque & Cinque, P.C.*,
  221 F.3d 71 (2d Cir. 2000) ...............................................................61

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  817 F.3d 782 (Fed. Cir. 2016) ...................................................26, 65

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  No.14-1856 (Fed. Cir.) ......................................................................37

*Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*,
  168 F. App'x 425 (Fed. Cir. 2006)...........................................*passim*

*Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*,
  323 F. Supp. 2d 512 (S.D.N.Y. 2004), *as modified* (June 22, 2004) ..................9

*Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*,
  No.01 CIV. 1898 (LAK), 2005 WL 351741 (S.D.N.Y. Feb. 14,
  2005), *dismissed sub nom. Romag Fasteners, Inc. v. Mitzi Int'l
  Handbag & Accessories, Ltd.*, 125 F. App'x 1005 (Fed. Cir. 2005)...................9

*Sage Products, Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997) ...................................................38, 60

*Senju Pharm. Co. v. Lupin Ltd.*,
  780 F.3d 1337 (Fed. Cir. 2015) .......................................................38

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
  820 F.3d 419 (Fed. Cir. 2016) ........................................................45

*Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.*,
  782 F.3d 313 (6th Cir. 2015) ..........................................................70

*Smoot v. United Transp. Union*,
  246 F.3d 633 (6th Cir. 2001) ..........................................................40

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  No.13-17622, 2016 WL 2993958 (9th Cir. May 24, 2016) .............................69

*T-Peg, Inc. v. Vermont Timber Works, Inc.*,
  669 F.3d 59 (1st Cir. 2012)..............................................................57

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
  549 F.3d 1381 (Fed. Cir. 2008) ...........................................51, 62, 63

*TechSearch, L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002) ......................................................... 68

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ......................................................... 45

*U.S. v. Ionia Mgmt. S.A.*,
   555 F.3d 303 (2d Cir. 2009) ............................................................. 4

**Statutes and rules**

15 U.S.C. § 1117(a) ............................................................................ 67

17 U.S.C. § 505 .................................................................................. 69

35 U.S.C. § 285 ........................................................................ *passim*

Fed. R. Civ. Pro. 50(a) ............................................................... 65, 67

Fed. R. Civ. Pro. 11 .......................................................................... 46

Fed. R. Civ. Pro. 37 .......................................................................... 46

## STATEMENT OF RELATED CASES

This cross-appeal relates to Fossil's appeals in *Romag Fasteners, Inc. v. Fossil, Inc.*, 16-1115 (Fed. Cir.) and *Romag Fasteners, Inc. v. Fossil, Inc.*, 16-1842 (Fed. Cir.). All three are consolidated for briefing and argument.

Romag's appeal from the District Court's Amended Final Judgment was decided on March 31, 2016, by a panel consisting of Circuit Judges Dyk, Wallace and Hughes. *Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782 (Fed. Cir. 2016).

## JURISDICTIONAL STATEMENT

This action arises under the Patent Laws, 35 U.S.C. § 1 *et seq.,* the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and state law. The District Court had jurisdiction pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331, 1338(a) and 1367(a). This Court has appellate jurisdiction pursuant to 28 U.S.C. §1295(a)(1). The District Court's final judgment, entered September 22, 2014, disposed of all claims except Romag's claim for attorneys' fees. On August 14, 2014, the District Court ruled that Romag was entitled to recover attorneys' fees, but did not determine the amount of the fees. On September 30, 2015, the District Court determined the amount of the fees. On October 13, 2015, Fossil and Macy's filed a notice of appeal of the fees award. On October 21, 2015, Romag filed a notice of cross appeal. On March 28, 2016 the District Court awarded Romag additional fees; Fossil and Macy's filed a notice of appeal from that decision on April 11, 2016.

# STATEMENT OF THE ISSUES

**Fossil's appeal:**

1.      Did the District Court abuse its discretion when finding this an exceptional case under the Patent Act, after weighing the totality of circumstances, including that: Fossil brought a "woefully inadequate" invalidity theory that "bordered on frivolous" and constituted nothing but "an attempt to prolong litigation and exponentially increase the cost and risk" to Romag of losing its core business asset; Fossil maintained other invalidity theories for years even though it ultimately admitted they were a "waste of everybody's time"; and Fossil defended the patent infringement claim only on the basis of a "phantasmagorical" (made-up) factual theory against which there was "overwhelming" evidence?  (No.)

2.      Under those same circumstances, did the District Court abuse its discretion in using its inherent power to sanction Fossil modestly by awarding Romag one patent expert's witness fee?  (No.)


**Romag's cross appeal:**

1.      Did the District Court correctly rule that bad conduct couldn't be a factor when making an "exceptional case" determination under the Patent Act, unless the bad conduct is independently sanctionable, even though *Octane Fitness*

directs courts to consider "the substantive strength of a party's litigating position"? (No.)

**2.** Did the District Court correctly hold that the *Octane Fitness* standard for attorneys' fees does not apply to the Lanham Act, even though the Patent and Lanham Acts have identical relevant language? (No.)

## STATEMENT OF THE CASE

Romag Fasteners, Inc. makes patented and trademarked magnetic snap fasteners used on handbags.  When Romag sued its former customer Fossil for using counterfeit Romag snaps, Fossil's manufacturer quickly admitted that it had used unauthorized (i.e., counterfeit) snaps.  But instead of acknowledging the infringement, Fossil launched a barrage of scorched-earth litigation attacks.  After a jury found Fossil liable, the District Court awarded Romag part of its attorneys' fees under the Patent Act.

The District Court found that Fossil's asserted indefiniteness invalidity defense, previously described as "woefully inadequate," "bordered on frivolous." It also found that Fossil doggedly asserted other invalidity defenses—which it never raised at trial and later admitted were a "waste of everybody's time"—in order "to prolong litigation and exponentially increase the cost and risk of pursuing a lawsuit."  At trial, Fossil ultimately defended against patent infringement only on the basis of a "phantasmagorical" story against which there was "overwhelming"

evidence. The District Court acted within its discretion in finding this case "exceptional" and awarding Romag some attorney's fees.

But it did commit two purely legal errors, holding that the *Octane Fitness* standard for Patent Act attorneys' fees doesn't apply to Lanham Act fees, even though the acts share idential relevant language; and it held that it couldn't consider the substantive weakness of Fossil's argument in its "exceptional case" determination.

This Court should affirm the District Court's fact-finding and exercise of discretion under the Patent Act, and remand so the District Court can determine whether additional fees are due under the Lanham Act.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

### A. Overview of the Facts.

Romag is a family company that makes magnetic snaps for closures on handbags and other leather goods.  The inventor, Howard Reiter, runs the company. (JA2537.)  He is a fourth generation fastener maker. (JA2533.)[1]  Romag and other Reiter family hardware companies have 26 employees in Connecticut; factories abroad make Romag's snaps. (JA2539-41.)  Romag owes its success to

---

[1]  This Court should view "the facts and evidence in the light most favorable to the verdict," *U.S. v. Ionia Mgmt. S.A.*, 555 F.3d 303, 305 n.1 (2d Cir. 2009); *accord Hebert v. Lisle Corp.*, 99 F.3d 1109, 1114 (Fed. Cir. 1996), and review the "factual determinations underlying an exceptional case finding for clear error."  *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1365 (Fed. Cir. 2013).

4

the quality and reputation of its snaps—and to the patent that protects Reiter's invention, U.S. Patent No. 5,777,126 ("the '126 patent"). (JA2560; JA2782-83; JA2552; JA2559-60; JA2599-2600; JA2576.) Romag's patented snap is strong, durable and dependable. (JA3094-95, JA3102.) It stamps the snaps with a registered trademark, "ROMAG," and the patent number. (JA2551-53; JA2560.)

Romag filed this lawsuit to stop infringing counterfeits used in Fossil handbags. Fossil, a former customer, directed that the handbags be made at a Chinese factory that it knew was untrustworthy. A publicly-traded company with annual sales over $2.5 billion, Fossil designed, imported and distributed nearly 700,000 handbags with counterfeit snaps bearing Romag's trademark and patent number (JA3855; JA3355; JA544).[2]

Factories outside the U.S., primarily in China, make Fossil bags to Fossil's specifications. (JA2804-05; JA2849-55; JA2968-69.) Fossil knew that by having Chinese factories make its bags, it ran the risk that it could end up buying, importing and selling counterfeit products. As one of Fossil's Directors acknowledges, "everyone knows" counterfeiting is a problem in China. (JA3179.) Fossil's director of product development for handbags admitted he knew that handbags components are counterfeited in China. (JA2849-50.)

---

[2] Romag also brought suit against retailers selling Fossil handbags with counterfeit snaps, including appellants Macy's, Inc. and Macy's Retail Holdings, Inc.

When Romag discovered the infringing snaps, Fossil's factory admitted to Fossil that it bought snaps—stamped with the patent number—from "a manufacturer which is not the authorized licensee of Romag," and that it used the counterfeits on Fossil's bags. (JA2941-43; JA4389.039.)  Fossil still refused to admit the snaps were fake. Instead, it invented a story that the District Court described as "phantasmagorical" ("something in a dream or created by the imagination," per *Webster's*) about how Romag somehow authorized the counterfeits.  (JA3199.) Fossil's own employee admitted at trial that consumers who bought Fossil handbags with counterfeit Romag magnetic snap fasteners were "defrauded." (JA3425-26.)

Fossil also took deliberately threatening but ultimately unsustainable legal positions. It asserted that the patent was invalid, and moved for summary judgment on indefiniteness.  The District Court ruled that Fossil's patent expert's conclusory "opinions are nothing more than an *ipse dixit*," and its argument wasn't just wrong, but "woefully inadequate" (JA1753), "border[ing] on frivolous." (JA6.) The District Court denied Fossil's motion, and acting *sua sponte*, granted summary judgment to Romag on indefiniteness.

On the eve of trial—three and a half years into litigation—Fossil admitted its remaining invalidity defenses (obviousness and anticipation) were "a waste of everybody's time," but still wouldn't withdraw them (JA2098). Indeed, it kept its

patent expert on its witness list.  But at trial Fossil never called the patent expert or asserted the invalidity defenses, choosing instead to rely on the story that the snaps were somehow authentic. The District Court found Fossil had asserted defenses merely in an "attempt to prolong litigation and exponentially increase the cost and risk of pursuing a lawsuit." (JA7.)

Given the "overwhelming" evidence (JA5), the jury rejected Fossil's story (JA4304), and the District Court found this an exceptional case under the Patent Act, warranting an award of attorneys' fees (JA6-7).

### B. Fossil Directs Its Chinese Factories to Use Romag Snaps and Buy Them from Romag's Only Authorized Chinese Manufacturer, Wing Yip.

Romag's relationship with Fossil began in 2002, when Fossil contacted Reiter to ask about Romag snaps. Reiter said Romag snaps were patent-protected. (JA2825; JA4389.20.)  Fossil was interested in buying snaps if Romag agreed to indemnify it. (JA2600; JA4389.21.)  Fossil wanted indemnification for using genuine Romag snaps because it had been paying patent royalties to another company for the use of magnetic snaps. (JA2810-11; JA2819; JA2978.)  To avoid litigation with that company, Fossil wanted to ensure that all Fossil bags had Romag snaps protected by their own patent and trademark.

Fossil liked Romag's samples and the agreement to indemnify (JA2601-03; JA4389.21-.22), and directed factories making Fossil handbags to use only Romag

snaps.  (JA2832-33; JA4389.021-.022.) Fossil's factories couldn't use other magnetic snaps in Fossil bags. (JA2833; JA2909.)[3]

The factories making Fossil bags bought Romag snaps from Wing Yip Accessory Manufactory Ltd. (JA2603; JA2979-81; JA2992; JA4389.24-.25), the *only* authorized source for Romag snaps in China (JA2825-28; JA2846-47; JA2938).

Wing Yip paid Romag a five-cent royalty for every Romag snap sold (JA51).  Wing Yip was founded by Timmy Cheung. Reiter's father and Cheung's father had long worked together, and Reiter chose to "partner" with Cheung because he wanted a "very deep relationship, somebody [he] knew and trusted with [his] new patented device."  (JA2578-79.)

In the years that followed, Romag and Fossil had little contact, as Reiter trusted the relationship (JA2613-2616; JA2986-87; JA4389.23), and Fossil knew that it and its manufacturers should deal directly with Wing Yip. (JA2749; JA2842; JA4389.28.)

---

[3] Fossil tries to re-argue the facts (at 6), but the evidence showed that untill August 2010 (JA4389.117), Fossil's Chinese manufacturer believed it had to use Romag snaps.  (JA2928-32; JA4389.118-.119.)

### C. Romag Polices Its Intellectual Property and Learns that Hechuang Is Selling Counterfeit Snaps to Fossil's Chinese Manufacturer, Superior.

Romag guarded the intellectual property protecting its business. When it discovered counterfeiting, it acted. In 2001, it sued handbag seller Mitzi International for infringement of its patent.  Romag won and this Court affirmed. *Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*, 168 F. App'x 425 (Fed. Cir. 2006). En route, it defeated Mitzi's attempt to invalidate the patent, which that court described as "frivolous."[4]

In 2007, Romag discovered counterfeit snaps on handbags sold at J.C. Penney, sought an injunction, and the parties quickly settled. (JA95-96; JA2688-89; JA2757). Again in 2009, Romag discovered counterfeit snaps on products at DSW, but the parties settled, avoiding litigation (JA96; JA2690; JA2757). Romag didn't know other customers were involved in counterfeiting, so didn't contact Fossil or other customers to tell them.  (JA2688-93.)

On May 12, 2010, Reiter got an email from "Joe," who said he was a former Wing Yip employee, and had "found [another] factory is producing your company's patent product…but they do not receive your company's

---

[4] *Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*, No.01 CIV. 1898 (LAK), 2005 WL 351741, at *2 (S.D.N.Y. Feb. 14, 2005), *dismissed sub nom. Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*, 125 F. App'x 1005 (Fed. Cir. 2005); *see also Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*, 323 F. Supp. 2d 512, 515 (S.D.N.Y. 2004), *as modified* (June 22, 2004).

authorization." (JA4389.11.) Neither Reiter nor Cheung knew a "Joe" from Wing Yip. (JA2616-18.) Reiter wrote back the next day: "So what do you want…to learn the factory name?" (JA4389.10.)

On May 20, Joe replied with the factory name: Hechuang. (JA2621.) He also attached evidence: purchase orders for Romag snaps sent to Hechuang, one from Dong Guan Red Lion Leather Products and one from Superior Leather. (JA2622-24; JA4389.10-.14) Hechuang, it would later become clear, was a manufacturer started in 2008 by former Wing Yip employees, who stole Romag's intellectual property and sold counterfeit Romag snaps. (JA52.) But Reiter had never dealt with Hechuang and didn't know. (JA2621-22.)

The purchase orders didn't say what the Romag snaps would be used for, so it wasn't possible to know what handbag company was using the snaps. (JA2622-23; JA2625.) That wasn't a surprise because purchase orders usually didn't contain that information. (JA2603-04.)

Four days after Joe's email, Reiter's wife, Romag general counsel Jody Ellant, got a phone call from her sister telling her she'd seen Romag snaps on Fossil bags at Macy's. (JA2611-13; JA4146-47.) Ellant didn't know Fossil was a Romag customer, so she suspected the snaps weren't authentic and told her sister to buy the bags. (JA2612.) Later that day, Ellant visited a Macy's and bought Fossil bags. (JA2612; JA4146.) She shared her suspicions with Reiter. But

because Fossil was a customer, Reiter didn't suspect it of using counterfeits, so he set aside the bags.  (JA2614-15.)

After long trips abroad (JA2627-29), Reiter began to wonder whether "Joe's" email about Superior's counterfeiting could be related to the Fossil bags. (JA2631-32.)  In mid-October 2010, he asked Wing Yip about sales of snaps to Superior (JA2631-33; JA4459), then took apart the bags and snaps and, thinking the snaps didn't look right, sent them on November 1 to Wing Yip.  (JA2637.)  A week later, Cheung wrote: "magnetic snap are counterfeit, we check the whole dimensions and logos…you can go ahead and fight this company."  (JA2636-37; JA4389.149.)

### D. Romag Confronts Fossil; Fossil's Manufacturer Informs Fossil It Used Counterfeit Snaps; Romag Sues.

On the day Cheung confirmed the snaps were counterfeit, Reiter emailed his Fossil contact asking for names of Chinese factories that manufactured its bags. (JA2637; JA4389.015.)  Fossil refused a week later. (JA4389.015.) Reiter called, but Fossil still refused—and it directed Reiter to its legal department. (JA2640-41.) Reiter's attorney sent a cease-and-desist letter two days later. (JA2641; JA4389.16-.19.)  Fossil's lawyer responded, identifying Superior as Fossil's supplier.  But it wouldn't cease and desist. (JA2643; JA4457-58.)

Within days, on November 22, 2010, Romag sued Fossil and Macy's, asserting patent infringement, trademark infringement, false designation of origin,

unfair competition and violations of the Connecticut Unfair Trade Practices Act

(CUTPA). (JA221-48.) Romag moved for a TRO enjoining Fossil from using

Romag's patent and trademark. (*See* JA172.)[5]  The Court granted the TRO

(JA313-21), later converted on consent to a preliminary injunction. (JA335-37;

JA173.)

Fossil answered, denying it infringed Romag's patent or trademark (JA326;

JA225-26) and asserting that the '126 patent was invalid. (JA327.)

Meanwhile, on December 2, 2010, just two weeks after this suit began, and

two weeks *before* it filed its Answer, Fossil's factory Superior sent an email

conclusively establishing that it had used unauthorized snaps:

> Our investigation reveals that the purchasing department in our
> factory made the mistakes of sourcing them from ***a manufacturer
> which is not the authorized licensee of Romag***.

(JA2941-43; JA4389.39 (emphasis added).) Superior later provided more

detail: it had sent Fossil 694,273 bags with counterfeit snaps originating in

"purchases from the supplier other than Wing Yip." (JA4389.40.)

Purchase orders and invoices confirmed that from 2008-10, Superior bought

hundreds of thousands of snaps designated as "Romag," even though they weren't.

(JA2783-85; JA4395.1-.218 (purchase orders and invoices); JA4395.219-.224

---

[5] On June 9, 2011, Romag sued other retailers that sold Fossil handbags with
counterfeit snaps. The District Court consolidated the actions. (*See* JA177.)

(select translations).)  They came from Hechuang—the counterfeiter that "Joe" identified.

Superior bought counterfeits even though it knew where to buy authentic Romag snaps.  In previous years, it had bought more than 3.1 million authentic Romag snaps from Wing Yip, receiving a uniquely-numbered certificate of authenticity with each shipment.  (JA4389.150-.164; JA2587-94.)

Despite overwhelming evidence that Superior hadn't bought the snaps from Wing Yip—the only authorized dealer in China—Fossil has *never* acknowledged that the snaps were infringing counterfeits.  (JA2941-43; JA4389.039.)

### E. The Parties' Claim Constructions and Experts' Opinions.

Instead of acknowledging its infringement, Fossil asserted patent invalidity defenses that came very close to (or were) frivolous. Chief among them were Fossil's attacks on the patent's disclosure of a tubular stem with a "hole therethrough" and the meaning of the term "rotatable."

### 1. Background on the '126 patent.

The patent discloses a magnetic snap in which a tubular stem having a "hole therethrough" engages with a magnet, connecting the snap's two halves. (JA245-46.)  The hole can be used to support the snap while its exterior is coated during manufacture, and lets light pass through the snap to permit the snap to be more accurately positioned on a handbag.  (JA243; JA2555.)

13

The claims also disclose legs on each half of the snap; the snaps' legs affix the snap to the end application.  (JA2544.)  The legs are "rotatable" with respect to the snap's washer.  (JA246.)  The rotatability feature allows coatings to reach all surfaces on the snap, giving greater protection against corrosion, and therefore greater durability. (JA244.)

### 2. Fossil argues that "rotatable" is an ordinary-language term, then asserts it's indefinite because the patent doesn't disclose a rotatability "test."

In claim construction briefing, Fossil argued that "rotatable" should have an ordinary-language construction: "capable of being rotated and not rigidly secured, i.e. does not resist rotation."[6]  (JA402.)  Fossil said its proposed "construction comports with the Court's construction in *Mitzi*," the 2001 infringement action brought by Romag, and that the *Mitzi* construction bound Romag.  (JA407; JA402.)  But the construction in *Mitzi* was different: "capable of being rotated and not rigidly secured. The pair of legs is not rigidly secured if it does not resist rotation. Rotatable, however, does not imply that the legs must rotate freely." (JA400.)

While claim construction was pending, Fossil moved for summary judgment on its claim that the patent was indefinite.  (JA442-62.)  Fossil contended that "regardless of how the Court chooses to construe 'rotatable,' the term is

---

[6] Romag's proposed construction was that the term meant "capable of being rotated, and neither rigidly secured nor freely rotatable." (JA382.)

14

indefinite." (JA439.) Fossil based its claim on its assertion that the "'126 patent and its prosecution history *fail to disclose a test* for determining whether these connected parts are rotatable." (JA445-46 (emphasis added)). In opposing summary judgment, Romag asked for an affirmative order declaring its patent definite. (JA1594.)

When summary judgment briefing was complete, the case was transferred to Judge Young. (JA1672-77).[7] After a *Markman* hearing, Judge Young held that "rotatable" means "capable of being rotated and not rigidly secured, i.e. the connection between the legs and the base washer allows for a change of position about the rotational axis." (JA1682.) This construction essentially paralleled the construction in *Mitzi*.

### 3. The District Court rules that Fossil's indefiniteness defense is "woefully inadequate" and grants summary judgment on it to Romag.

The District Court denied Fossil's summary judgment motion, ruling the patent wasn't indefinite because there was no need to provide a test for "rotatable." The District Court held that a term requires a "test" only if (1) the claim calls for a measurement that can be made by several methods that yield conflicting results; or

---

[7] The case was initially assigned to Judge Droney, who was elevated to the Second Circuit, after which the case was assigned to Judge Kravitz, who presided over it until his death in October 2012. It then was briefly assigned to Judge Underhill (JA185; JA375), whose only order was to request a status report (JA178), before being transferred in January 2013 to visiting D.Mass. Judge Young (JA1898) as part of efforts to resolve overcrowding in the then-understaffed D.Conn.

(2) a person having ordinary skill in the art would deem a specific method of

measurement important to the claim.  (JA1752-53.)  Fossil hadn't tried to show

that the adjective "rotatable" fell into either category.

Having denied Fossil's motion for summary judgment, the District Court

granted summary judgment on indefiniteness *in Romag's favor*, finding it

warranted because of Fossil's "woefully inadequate showing."  (JA1753.)  The

order addressed stark shortcomings in the report of Fossil's expert, Frederick

Kucklick:

> Other than mixed fact-law opinions on anticipation and file wrapper
> estoppel, Kucklick opines only that
>
>> the '126 patent does not provide an acceptable way to
>> quantify the degree of force necessary to consistently
>> define the term 'rotatable' for invalidity and infringement
>> purposes. The '126 patent is silent regarding the degree
>> of force necessary to qualify the attachment legs as
>> 'rotatable' relative to the base washer. [JA964-65.]
>
> [citation] That's it.  While these statements are true, this Court's
> construction of "rotatable" renders them immaterial. What is more,
> these opinions are nothing more than an *ipse dixit,* and the Federal
> Circuit has concluded that such general and conclusory testimony
> "does not suffice as substantial evidence of invalidity" sufficient to
> carry the defendants' burden of proof. *Koito Mfg. Co., Ltd. v. Turn–
> Key–Tech, LLC,* 381 F.3d 1142, 1152 (Fed. Cir. 2004)…

(JA1756.)

The court found that Kucklick's report lacked analysis.  Its two-page

discussion of indefiniteness began with a comment from a charge conference

transcript in *Mitzi*, where the judge there said the "Empire State building is rotatable in its foundation as far as you folks are concerned and I regard that as essentially ridiculous if you get a big enough gorilla to grab it and twist it." (JA963; JA1418-19.) Yet Fossil—having argued for the adoption of *Mitzi*'s construction of "rotatable"—knew that Judge Young didn't hold that "rotatable" was indefinite or require some kind of "test."  (JA404; *see* JA413.92-.93.)

Kucklick said Romag distinguished prior-art references on the grounds of rotatability (JA964) but never explained how that made "rotatable" indefinite. And he observed that prior art references had some similar features (e.g., "employ rivets") but never explained why that made "rotatable" indefinite. Kucklick's report abruptly ended with the conclusory "*ipse dixit*" paragraph reproduced above.

### 4. Fossil's remaining invalidity defenses had grave flaws.

Fossil maintained other invalidity defenses; Kucklick's report contended the patent was invalid due to anticipation and obviousness.  (JA939-1002.)  The anticipation argument required showing that the hole through the tubular stem was disclosed in prior-art, but Kucklick was mistaken, as the reference he cited had no through-hole.  (JA1218-19.)  Fossil's obviousness argument had other problems: it offered no good reason to think a person having ordinary skill in the art would have incorporated a through-hole into the snap's tubular stem.  (JA1223-26.)

Fossil ultimately gave up in front of the jury: "Reiter got a patent [for a snap]…it's got a through hole in it. So he didn't invent the magnetic snap, but he invented a through hole in it so it could be coated for processing." (JA2524.) When push came to shove, it acknowledged Reiter invented a new kind of snap.

### 5. Fossil's non-infringement lacked evidence.

Fossil maintained two non-infringement defenses besides invalidity.

First, citing Kucklick's report, Fossil asserted that the '126 patent didn't read on its snaps. (JA1204.)

Fossil also had left itself room to assert a second sort of non-infringement defense, for which Fossil retained a second patent expert, James Rice. Rice asserted that the measurements of the accused snaps on the Fossil bags didn't prove that the snaps came from somewhere other than the authorized Wing Yip factory. (*See* JA1641.53-.54.)

Rice's report didn't address the fact that Superior had already admitted that it bought the snaps from an unauthorized manufacturer. Nor did it address the invoices and purchase orders confirming that Superior bought the snaps from Hechuang. Finally, Rice's report never asked why, if Superior had really bought authentic Romag snaps, it didn't buy them from Wing Yip, from which it had previously bought millions of snaps.

### F. Fossil Finally Admits Its Invalidity Defenses Are a "Waste of Everybody's Time," But Still Won't Withdraw Them Before Trial.

After the summary judgment decision, the case was assigned to Judge Arterton. (JA1759.)  Fossil submitted a pre-trial memorandum contending that Romag couldn't show that the snaps on the Fossil bags were counterfeit.  (JA1816-18.)  Fossil relied on Rice's report, but didn't rely on Kucklick's invalidity or non-infringement analyses.

Two days later, on February 12, 2014, Romag noted to the District Court that Fossil's memorandum hadn't discussed any of its invalidity theories or even its element-by-element non-infringement defense:

> There is nothing in the document…about patents. When we asked [Fossil's counsel] in a phone conversation last week in a meet and confer whether they were pursuing any patent defense at all, he refused to answer saying he'll determine it at trial.…[I]t's very difficult to go to trial on a patent case as it is…and it's even more difficult  when we don't even know whether the defendant is putting in a defense. Either they're putting in one or they're not. . . . We need the experts. We need to be prepared for their response at trial. This is not a guessing game. I think at this point, this goes to trial, we're entitled to know whether those patent issues are still before the Court or whether they are withdrawn.

(JA2094-95.)

Fossil didn't say whether it would assert the invalidity and element-by-element non-infringement defenses—the positions in Kucklick's reports—at trial. Instead, Fossil's counsel said:

> I think we *might* be able to stipulate something along the lines that, you know, if they're established to be counterfeits, then, you know, we're not contesting infringement. If they're—you know, *on validity, I don't know, I have got to recircle back with all of the defendants*, but in my view it's a $28,000 claim. So I'm sort of in agreement it's a waste of everybody's time to litigate it at this point.

(JA2098 (emphasis added).)[8] The parties never entered a stipulation.

On March 5, 2014, at a pretrial conference less than three weeks before trial, the District Court again asked Fossil whether it would assert its remaining invalidity defenses.  Fossil said it wasn't asserting those defenses "at *this* point." (JA2107 (emphasis added).)  Later in the conference, Fossil said "I *think* we indicated that validity defenses would not be asserted." (JA2190 (emphasis added).)  Yet Fossil never said it wouldn't assert the element-by-element non-infringement defense in Kucklick's report, never removed Kucklick from its witness list, and never said it wouldn't try to prove that Romag's patent claims didn't read on its snaps.

### G. At Trial, Reiter Testifies on Validity and Fossil Offers Only a "phantasmagorical" Story that the Unauthorized Snaps Are Somehow Authentic.

The jury trial began on March 24, 2014.  Romag called several witnesses, first and foremost Reiter, who testified that his invention was a "better mousetrap," superior to the prior art.  (JA2549.)  It "improve[d] both . . . the way the magnetic

---

[8] Fossil apparently calculated that the patent claim was worth $28,000—and a "waste of everybody's time"—based on Wing Yip's royalty rate of $0.05 per snap. The jury later awarded $66,372.75. (JA4304.)

circuit worked and the manufacturability of the product." (JA2550.) Whereas

"earlier patents required that the central pin be solid," he testified:

> we made ours hollow . . . to . . . help the efficiency of our
> manufacturing and assembly process. . . . [T]he element that helped us
> make a better mousetrap, the hole through the center of the pin, also
> gave us the ability to identify the magnet as distinct from other
> patented magnetic snaps by just looking at it.

(JA2555.) Reiter testified that the invention was enormously successful, with

Romag producing 57 million snaps over the years. (JA2575.) Reiter told how he

discovered Fossil's infringing snaps, and how their dimensions and other

characteristics proved that they couldn't have been manufactured on Wing Yip's

machinery. (JA2645-60.)

Romag's patent expert, Udo Schwarz, testified that Fossil's snaps infringed,

performing an element-by-element analysis of the '126 patent claims. (JA3135-

55.) Fossil briefly cross-examined Schwarz on chain-of-custody issues (JA3157)

but not on his infringement analysis. Fossil never called Kucklick to support its

invalidity contentions, to counter Schwarz's infringement analysis, or for anything

else.

Instead, Fossil argued the absolute opposite position: that Fossil's snaps

were actually authentic Romag snaps, and so couldn't have infringed Romag's

patent. Fossil called Rice to try to counter Reiter's testimony that the snaps

couldn't have been manufactured on Wing Yip's machinery. (*See* JA3490-95.)

21

But neither Rice nor Fossil ever coherently explained how snaps that Superior bought from Hechuang could have been authorized by Romag.

The evidence that Fossil offered to support its authorized-by-Romag theory was the fact that Wing Yip had failed to pay some royalties to Romag when it sold authentic snaps *to Superior*.  There was no dispute that Wing Yip had correctly recorded the sale to Superior on its books or that it had given Superior an appropriate certificate of authenticity together with authentic snaps.  (JA2769-71.) Fossil never explained how the past sale of *authorized* snaps *from Wing Yip* to Superior had anything to do with the sale of *unauthorized* snaps *from Hechuang* to Superior.

The District Court concluded that "the evidence that the Fossil handbags produced by Superior contained non-genuine snaps was overwhelming."  (JA5.) Fossil's position was so frivolous that the District Court described it as "phantasmagorical".  (JA3199.)

### H. Romag Shows Fossil Acted with Callous Disregard for Romag's Rights.

Romag also presented evidence showing that Fossil infringed Romag's trademark with "callous disregard" of Romag's rights. (JA3926-27; JA4297.)  As a consumer fashion brand, Fossil aggressively protected its *own* intellectual property (JA3181-84; JA3295-98).  And Fossil knew that the components in its bags could

be counterfeited if unscrupulous Chinese factories looked to cut corners.  (JA2849-50; JA3179.)

Romag showed that Fossil bags had only two trademarked components containing trademarks: Romag snaps, and zippers made by YKK, the world's largest zipper manufacturer.  (JA2889-91; JA2999.)  Fossil inspectors *were trained to monitor the authenticity of the YKK zippers* and to ensure that Fossil factories got the zippers from a legitimate source.  (JA3324-26; JA3314; JA3341-45; JA2890.)  But Fossil took no steps to monitor the authenticity of snaps made by Romag, a small family business, even though it had the contractual authority to inspect Superior's books and invoices.  (JA2901-06; JA2912; JA4389.31.)

Moreover, Romag showed that Fossil knew that Superior couldn't be trusted in its sourcing of materials.  Fossil had previously canceled an order to Superior for handbags that coincidentally used Romag snaps.  Because Superior had already bought the snaps, Fossil had to pay Superior the cost of the materials.  When presented with the costs, Fossil balked—and told its inspectors to verify that Superior had actually used Romag snaps—because it *doubted that Superior had really spent the extra money on Romag snaps*, rather than on cheaper generic or counterfeit snaps.  (JA2928-31; JA4389.117.)

On another occasion, Superior quoted Fossil a price for handbags that it would manufacture.  Fossil thought the price was too high and asked Superior to

break down the costs. (JA2913-17; JA4389.130-.131.)  Superior said that the use of a brand-name YKK zipper increased the cost. A lead Fossil inspector, its "eyes and ears in China" (JA2878; JA2968-69), doubted Superior was using YKK, repeatedly noting Superior had "lie[d]" and "ma[d]e up some story" to support unreasonable price quotes. (JA4389.130.)

At trial, a Fossil director—to whom Fossil inspectors reported—testified that Superior lied repeatedly, and it didn't care that it lied.  (JA3331-32.)

In short, Fossil knew it could determine whether a Romag snap was genuine just by seeing where it came from: If it came from Wing Yip, it was genuine; if it didn't, then it was counterfeit.  But Fossil never bothered to do this simple check.

## I.  The Jury Returns a Verdict for Romag and Finds that Fossil Acted with "Callous Disregard," Though Not "Willfully."

The jury found Fossil liable for trademark infringement, false designation of origin and state statutory and common-law unfair competition.  It awarded $90,759.36 of Fossil's profits to prevent Fossil's unjust enrichment.  (JA4297.) The jury also awarded $6,704,046 of Fossil's profits to deter future trademark infringement, having been instructed that such an award would be appropriate only if Romag proved that Fossil had demonstrated a "*callous disregard* of the known rights of Romag as a mark holder." (JA3926 (emphasis added); JA4297.)  The jury found that Fossil and Macy's had infringed Romag's patent, awarding damages of $51,052.14 and $15,320.61 against those defendants, respectively.  (JA4304.)

24

While it found that Fossil acted with "callous disregard" in infringing Romag's

rights, the jury didn't find that the culpable conduct was "willful." (JA4295-4303.)

### J. After A Bench Trial, the Court Reduces Patent Damages and Sets Aside the Entire Award of Trademark Profits.

After the jury verdict, the District Court held a two-day bench trial on

equitable issues, then issued a final memorandum of decision. (JA49-90.)  It found

that Romag should have brought suit shortly after Reiter received the anonymous

May 20, 2010 email from "Joe" stating that a Chinese factory was making

counterfeit snaps.  (JA4389.010-.014.) The email didn't mention Fossil, Macy's or

any other defendant. (*Id*.) Nevertheless, the District Court thought that Reiter

should have immediately inspected the Fossil bags bought by his wife and sister-

in-law. (JA108.)

Moreover, the District Court thought Reiter should have searched through

his electronic documents for any reference to the word "superior"; if he had, the

court concluded, he would have found a single email, several years old, forwarded

to him, in which the word "superior" appeared among the domain names in the

"cc" field.  (JA106-07; JA265-66.)

Believing that Romag should have sued shortly after receiving the email in

late May 2010, rather than six months later in November 2010, the Court ruled that

Reiter's TRO application had misleadingly omitted the events of May 2010 and

falsely stated that in November he was shocked to discover the counterfeits.[9] The

court concluded that laches—due to the several-month delay—should reduce the

patent recovery by 18%, making for a total recovery of $54,425.65. (JA111.)

The District Court also concluded that because the jury had found that

Fossil's trademark infringement wasn't "willful," Romag couldn't recover any

profits as a matter of law, including the $6.7 million that the jury allocated to

necessary deterrence (JA129.)[10]

### K. The District Court Rules This Is an Exceptional Case under the Patent Act and Also Awards Fees under State Law.

After the bench trial, and after denying post-trial motions for judgment and a

new trial (JA91-156), the District Court found that this was an exceptional case

under the Patent Act, entitling Romag to an award of attorneys' fees. The Court

gave three reasons: (1) Fossil's indefiniteness defense "bordered on frivolous"

(JA6); (2) Fossil didn't withdraw other invalidity and non-infringement defenses

until after trial, and maintained its patent expert on its witness list throughout trial

(JA6), and (3) Fossil "aggressively pursue[d] invalidity counterclaims in an

---

[9] The District Court never suggested that the TRO shouldn't have been granted, and it ultimately issued a permanent injunction, (JA89-90), making clear that Fossil's infringement had to be enjoined—both preliminarily and permanently.

[10] *Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782 (Fed. Cir. 2016) affirmed, recognizing a split among the Circuits. Romag's petition for certiorari to the U.S. Supreme Court is due on August 15, 2016. Order of May 25, 2016, U.S. Supreme Ct. Case No. 2014-1856/2014-1857 (granting extension).

attempt to prolong litigation and exponentially increase the cost and risk of pursuing a lawsuit," and did so where the snaps represent a minute portion of Fossil's business but the '126 patent is Romag's primary business asset. (JA7.)

As part of this analysis, the District Court also considered Romag's laches and conduct in its pursuit of the TRO, but concluded that "these issues were limited in scope and have already been addressed, [so there is] no need to further sanction Plaintiff by denying an award of fees in this case." (JA7.) The District Court declined, as a matter of law, to consider an award under the Lanham Act, because the jury had concluded that infringement wasn't "willful." (JA7-9.)

The District Court also found attorney's fees appropriate under CUTPA, noting that under that state statute, fee awards were customary for the prevailing party. (JA12-15.) But it didn't find fees appropriate under the Lanham Act, even though the relevant statutory language there is identical to the Patent Act, because it didn't believe that *Octane Fitness* governs fee awards under the Lanham Act. In a later opinion, the District Court quantified the fees award. (JA46.) Recognizing that the vast majority of the attorneys' work on the case involved more than one cause of action, it held that Romag couldn't receive attorney's fees for work solely attributable to certain Lanham Act theories. (JA31-33.)

The District Court ultimately awarded $2,368,494, reducing the more than $3 million in fees sought to account for the delay due to laches, work solely

attributable to certain Lanham Act theories, as well as several other factors. (JA28-33; JA46-47.)  Under its inherent power, the Court also awarded $54,877 to compensate Romag for the cost of one patent expert's testimony, because Fossil had raised, for improper purposes, an entirely meritless indefiniteness defense. (JA37-38.) It denied all other expert fees sought. (JA38.)

The District Court later awarded $288,857 in additional attorney's fees, out of nearly $400,000 sought, for work litigating the earlier fee petition and other post-trial work. (JA48.007.)

Fossil appealed both fee awards and Romag timely cross-appealed.

## SUMMARY OF THE ARGUMENT

The District Court acted within its discretion in deeming this an "exceptional" case.  Its conclusion that Fossil's employment of invalidity defenses in this case "bordered on frivolous" constitutes a finding of fact, which the District Court, having seen the parties' litigation tactics firsthand, was well-positioned to make.

Fossil attacks the summary judgment ruling on indefiniteness rendered against it, so it can claim its position was reasonable, but it never appealed from the summary judgment ruling. Moreover, it never argued below any of the considerations it now says the District Court should have taken into account.

Finally, these newly-proffered considerations aren't just waived: they're also insufficient to meet Fossil's burden of showing clear error and abuse of discretion.

Having presided over the pre-trial conferences as well as the trial and post-trial, the District Court knew that Fossil never really withdrew its other invalidity defenses. Fossil's refusal to withdraw these defenses—which it ultimately admitted were a "waste of everybody's time"—required Romag to retain a patent expert and to introduce trial evidence on invalidity and infringement. As the District Court correctly found, Fossil's years-long maintenance of these defenses was "an attempt to prolong litigation and exponentially increase the cost and risk" to Romag, for whom the '126 patent is its primary asset. The District Court also acted within its discretion in explicitly weighing other non-dispositive factors determining that this was an "exceptional case" warranting attorney's fees.

Because of Fossil's tactics and maintenance of wasteful and near-frivolous invalidity defenses, the District Court properly exercised its inherent authority to require Fossil to pay for one of Romag's expert witnesses. The award of supplemental fees was likewise appropriate, as Romag succeeded in the underlying fee petition.

Nevertheless, the District Court made two errors of law. It wrongly held that it couldn't base its finding that this was an "exceptional case" solely on the fact that Fossil defended against patent infringement only a "phantasmagorical" theory

against which there was "overwhelming" evidence, even though *Octane Fitness* says a district court should give "substantial weight" to the weakness of a losing party's position. It also erred in declining to apply the *Octane Fitness* standard to the Lanham Act, which contains fee-shifting language identical to the Patent Act.

## FOSSIL'S APPEAL

### I. The District Court Acted Well Within Its Discretion in Finding This an Exceptional Case.

#### A. The District Court Has Wide Discretion in Determining Whether a Case Is Exceptional.

The Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n 'exceptional' case…stands out from others with respect to the substantive strength of a party's litigating position…or the unreasonable manner in which the case was litigated. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances… '[t]here is no precise rule or formula for making these determinations.'" *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (*quoting Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534 (1994)). In determining exceptionality, a district court properly considers "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of

compensation and deterrence." *Octane Fitness*, 134 S. Ct. at 1756 n. 6 (*quoting*

*Fogerty*, 510 U.S. at 534.).

The Supreme Court has recently expounded on the *Fogerty* factors, holding

that a district court should give "substantial weight" to the reasonableness of a

losing party's position "because it both encourages parties with strong legal

positions to stand on their rights and deters those with weak ones from proceeding

with litigation." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. ___, No.15-375,

slip op. at 6-7 (June 16, 2016). But "in any given case a court may award fees even

though the losing party offered reasonable arguments…For example, a court may

order fee-shifting because of a party's litigation misconduct, whatever the

reasonableness of his claims or defenses." *Id.* at 11.

Under these principles a district court may reasonably determine[] that the

case [is] exceptional" even if a party's "litigation conduct [is] not quite

sanctionable." *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 483

(Fed. Cir. 2016).

### B. A District Court's Exceptional Case Finding Is Reviewed under an Abuse-of-Discretion Standard.

"[A]n appellate court should apply an abuse-of-discretion standard in

reviewing all aspects of a district court's § 285 determination. Although questions

of law may in some cases be relevant to the § 285 inquiry, that inquiry generally is,

at heart, 'rooted in factual determinations.'" *Highmark Inc. v. Allcare Health*

*Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1749 (2014) (*quoting Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990)).  "The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error." *Highmark*, 134 S. Ct. at 1748 n. 2 (*citing Cooter & Gell*, 496 U.S. at 405).

Under this highly deferential standard, even if this Court doubts whether conduct "standing alone, could justify an 'exceptional case' finding," a district court doesn't abuse its discretion when "factoring in this conduct as part of its consideration of the 'totality of the circumstances.'" *Homeland Housewares, LLC v. Sorensen Research*, 581 F. App'x 877, 881 (Fed. Cir. 2014).

Moreover, even when "the specific examples of vexatious conduct recited by the district court are somewhat tenuous," and this Court finds it "difficult to infer bad faith on the part of [a litigant] when each action is viewed individually," it nevertheless defers to the district court's overall finding as to whether a case is exceptional.  *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551-52 (Fed. Cir. 1989).  Even a district court's "finding of reasonableness" with respect to a party's litigating position doesn't "cabin[ ] how a district court must structure its analysis and what it may conclude from its review of relevant factors." *Kirtsaeng*, slip op. at 12.

## C. The District Court Correctly Assessed the Totality of the Circumstances.

The District Court found that Fossil had taken tenuous positions on the facts and had litigated in an unreasonable manner. It described three factual findings supporting its assessment of the totality of the circumstances: (1) Fossil's indefiniteness defense bordered on the frivolous; (2) Fossil chose not to withdraw its other invalidity defenses until after trial; and (3) attorney's fees were needed to compensate Romag and deter Fossil and similarly-situated defendants from using bullying litigation tactics that could undermine the protection of patents and the survival of small businesses that depend on them.

Fossil doesn't contend that the District Court inaccurately weighed these three factors and thus misconstrued the totality of the circumstances. Instead, it contends that the District Court *clearly erred* with respect to *every one* of these three factual findings.  Yet Fossil offers nothing close to the sort of evidence necessary to disassemble the District Court's factual findings. The District Court personally watched Fossil litigate this case at every point after summary judgment, through both a jury trial and a bench trial and it properly found that Fossil's defenses to the infringement claims amounted to either "phantasmagorical" accounts of the facts or legal theories maintained only to bully a much smaller opponent into giving up.

1.  **The District Court acted within its discretion in holding that Fossil's indefiniteness defense bordered on frivolous.**

Fossil spends many pages attacking the District Court summary judgment decision that rejected its indefiniteness defense. (Fossil Br. at 47-50.)  In that decision, the District Court found that Fossil had proffered an expert opinion so conclusory that—even if relevant—constituted "nothing more than an *ipse dixit*." (JA1756.) But it wasn't relevant: Fossil's expert opinion was "immaterial" (JA1756) and Fossil had come forward with nothing but a "woefully inadequate showing." (JA1753.)

Arguing that the District Court clearly erred, Fossil now asserts that Judge Arterton's citation to Judge Young's decision isn't subject to abuse-of-discretion review.  But it is: Judge Arterton's evaluation of Fossil's motivation in, and the propriety of, pursuing summary judgment, and maintaining the indefiniteness defense is a finding of fact, which Judge Arterton, having seen Fossil's litigation tactics firsthand was uniquely positioned to assess.

Although Fossil doesn't assert that its indefiniteness defense was meritorious, it nonetheless suggests that the underlying District Court order granting summary judgment to Romag on Fossil's invalidity defense was mistaken. Fossil's effort to malign the ruling fails for three independent reasons.

First, the collateral attack is improper, as Fossil never appealed from the summary judgment ruling.

Second, and crucially, Romag never presented to the District Court any of the factual considerations that it now contends are relevant to that court's factual finding that Romag's position was borderline frivolous.

Third, even if Fossil's new arguments had been presented to the District Court, and even if they didn't amount to a collateral attack on the un-appealed summary judgment ruling, they would still lack merit.

### a. Judge Arterton saw Fossil's litigation tactics firsthand, assessed Fossil's motivation in asserting the indefiniteness argument, and considered the frivolity of the argument in finding this an "exceptional case."

Fossil asserts that Judge Arterton shouldn't have invoked Judge Young's decision in her "exceptional case" finding, and that because she did so, that finding should be subject to a more searching standard of review. (Fossil Br. 42.)  The assertion flouts *Highmark*, which unequivocally held that the abuse-of-discretion standard applies to "*all aspects* of a district court's § 285 determination." *Highmark*, 134 S. Ct. at 1749 (emphasis added).  The abuse of discretion standard applies because the determination as to whether the case was exceptional is "at heart, 'rooted in factual determinations.'" *Id*. (*quoting Cooter & Gell*, 496 U.S. at 401).  A district court's evaluation of the reasonableness of a party's litigation position is itself a factual determination, based on the district court's overall consideration of "all the circumstances of a case." *Cooter & Gell*, 496 U.S. at 401-02.

Thus, when the District Court concluded that Fossil's indefiniteness defense "bordered on frivolous," it made a factual determination under all the circumstances of the case, including Fossil's refusal to withdraw other weak invalidity defenses and its decision to defend against infringement only with the factual theory that Fossil's Chinese factory had somehow gotten ahold of authorized Romag snaps, a position that the District Court considered "phantasmagorical" (JA3199), *and which Fossil's own documentation showed was pure fiction*.  (JA4389.39-.40 (emails from Superior to Fossil); JA4395.011-.224 (purchase orders and invoices evidencing sales from Hechuang to Superior).)

Judge Arterton "live[d] with the case."  *Highmark*, 134 S. Ct. at 1748.  She saw the parties' true colors as they appeared before her over the course of at least fifteen days before and through trial, including ten days of evidence, and she resolved dozens of substantive motions (JA193-209.)  Judge Arterton was uniquely positioned for "factoring in…conduct as part of [her] consideration of the 'totality of the circumstances.'" *Homeland Housewares*, 581 F. App'x at 881.

As part of that factoring, Judge Arterton appropriately reviewed the summary judgment ruling—along with Kucklick's paltry analysis and Fossil's accompanying memorandum.[11]  Judge Arterton's citations to that ruling don't

---

[11] Fossil repeatedly takes issue with the District Court's discussion of the "tenor" of the summary judgment decision, insinuating that the court embarked on a speculative exercise (Fossil Br. 35, 42, 51), but there was nothing ambiguous about

mean, as Fossil claims, that Judge Arterton didn't do her job. It means, rather, that she agreed with the prior judge's conclusion that Fossil's indefiniteness defense bordered on the frivolous.

### b. Fossil never appealed the summary judgment ruling rejecting its indefiniteness defense—and cannot now collaterally attack it.

Fossil's collateral attack on the summary judgment ruling is improper. Fossil could have appealed the summary judgment ruling after the District Court's entry of final judgment on the merits. On such an appeal, Fossil could have argued that the District Court should have applied the *Nautilus* standard (Fossil Br. at 44-46), that consideration of the earlier *Mitzi* case would have led to a different result (*id.* at 46-47), or that the District Court erred procedurally in granting summary judgment (*id.* at 47-50).[12]

But Fossil chose not to appeal the summary judgment ruling. Indeed, Fossil chose not even to raise the issue on cross-appeal when Romag appealed—despite the fact that Fossil chose to file a cross-appeal *on another issue.* (*See* Princ. and Resp. Br. (Doc. No.33), pp.3-4, *Romag Fasteners, Inc. v. Fossil, Inc.*, No.14-1856 (Fed. Cir.).) It decided not to appeal it even though, when it filed its cross-appeal,

---

the tenor of a decision that described Fossil's offerings as "nothing," "*ipse dixit,*" "immaterial" and "woefully inadequate." (JA1753-56.)

[12] Fossil could have raised all of these issues, as the Supreme Court released *Nautilus* on June 2, 2014, more than two months before the District Court ruled on **post-trial motions on August 8, 2014. (JA215.)**

it knew Romag had relied on the summary judgment ruling in its attorney's fees motion. (*See* JA212-14; JA4328.)

Having chosen not to appeal the summary judgment ruling, Fossil cannot now collaterally attack it by asking this Court to disregard it. *Cf. Celotex Corp. v. Edwards*, 514 U.S. 300, 313, (1995) ("If dissatisfied… respondents can appeal . . . . Respondents chose not to pursue this course of action, but instead to collaterally attack . . . . This they cannot be permitted to do without seriously undercutting the orderly process of the law."). The summary judgment ruling is final and settled, and Fossil's efforts to undermine the District Court's reliance on that ruling necessarily fail.

### c. Fossil never presented to the District Court any of the arguments that it now makes to say its indefiniteness defense was reasonable.

In its improper collateral attack on the Summary Judgment Ruling, Fossil raises arguments that it never presented to the District Court. "[A]ppellate courts do not consider a party's new theories, lodged first on appeal. If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court." *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997); *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1350 (Fed. Cir. 2016); *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1346 (Fed. Cir. 2015).

Fossil now makes five contentions about its position on indefiniteness, all for the first time: (1) it was "deprived . . . of the opportunity to present all of its evidence" (Fossil Br. 47); (2) Kucklick's "undisputed truths" were disregarded (*id*. 50); (3) a status-conference comment by the judge in the *Mitzi* case shows that its position was reasonable (*id*. 46-47); (4) its "confidence" in moving for summary judgment, and Romag's decision not to move for summary judgment, means Fossil must not have had an unreasonable argument (*id*. 50-51); and (5) because *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) clarified an indefiniteness standard that wasn't previously clear, its indefiniteness position cannot have been unreasonable.[13] None of these arguments was made to the District Court. (JA4354.28-.31.) The arguments are therefore waived.

While a litigant must always give the district court a chance to consider its arguments before asking a circuit court to reverse, the rule of appellate waiver is at its most forceful when a litigant contends that a district *clearly erred* in making a *factual finding*. *Hormel v. Helvering*, 312 U.S. 552, 556 (1941) ("Ordinarily an appellate court does not give consideration to issues not raised below...[It] is essential…to offer all the evidence…relevant to the issues *which the trial tribunal*

---

[13] *Nautilus* came down June 2, 2014, after the summary judgment ruling (*see* Fossil Br. 44-46), but more than six weeks before Fossil's new-trial motion was due on July 18, 2014. (JA214-15.)  Fossil might have invoked *Nautilus* to argue for a new trial, but didn't, thereby "waiv[ing] arguments on appeal that are based on that change in the law." *Rentrop v. Spectranetics Corp.*, 550 F.3d 1112, 1117 (Fed. Cir. 2008). Fossil sought a new trial on grounds *other* than *Nautilus* (*See* JA4355-56.).

*is alone competent to decide*") (emphasis supplied); *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1282 (Fed. Cir. 2012) (finding waiver where, to resolve issue, district court "would have to [have] conduct[ed] additional fact finding," in contrast to a case where "the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice"); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987) (where "[t]he analysis is in large part fact-based and, in any event, is primarily addressed to the discretion of the trial court . . . it would be especially imprudent for an appellate court to address the issue in the first instance."). "The purpose behind the waiver rule is to force the parties to marshal all of the relevant facts and issues before the district court, the tribunal authorized to make findings of fact." *Smoot v. United Transp. Union*, 246 F.3d 633, 648 n.7 (6th Cir. 2001) (internal quotation marks and citation omitted).

Fossil's request to this Court to analyze its five new contentions violates the cardinal rule that a party cannot ask a circuit court to find clear error on a factual finding and reverse because of factors that allegedly should've gone into the factual analysis *but which the party never asked the district court to consider.*

d. **Fossil's attacks on the summary judgment ruling also lack merit.**

Even if this Court chose to consider Fossil's efforts to attack the summary judgment ruling without having appealed it, and to consider the arguments even though they weren't presented to the District Court, those arguments fail.

### i.    Fossil put on all its evidence.

Fossil wasn't "deprived" of the opportunity to present evidence to the District Court.  (Fossil Br. 47.)  In making this argument, Fossil points only to a single page of Kucklick's report (JA964), arguing that the District Court:

> never considers any of [sic] this evidence, because Fossil chose not to present it in its motion for summary judgment . . . .  Had Fossil received notice before Judge Young's *sua sponte* grant of summary judgment, Fossil would have presented it.

(Fossil Br. 48.)  But Fossil *did* present its evidence as part of the summary judgment briefing.  It submitted a *five page list of evidence* as part of its summary judgment briefing. (JA476-81.) That included the very page that Fossil now erroneously says wasn't included (*see* JA964 (Kucklick's invalidity report, reciting Reiter's statement on prosecution history), and it included Reiter's statement on prosecution history (JA1410-11). The District Court even quoted from Kucklick's short and conclusory analysis—indeed, it quoted from the very page that Fossil now describes as the evidence that it would have put before the court.  (JA1756 (summary judgment ruling).)[14]

---

[14] An appeal by Fossil complaining about lack of notice would've been fruitless. (*See* JA1754 (citing *inter alia Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 64 (2d Cir. 2012); JA1756 ("summary judgment record had already been developed; there was no indication that any additional evidence was forthcoming, nor, given the fact that definiteness is a question of law, any suggestion that additional evidence would dictate a different outcome"); JA1594 (Romag's request, in opposition to summary judgment, for ruling deeming patent definite—precisely the relief later provided in summary judgment order).)

### ii.    The District Court accepted Kucklick's factual assertions as true—and irrelevant.

Contrary to Fossil's argument (Fossil Br. 49-50), the District Court did take proper account of Kucklick's "true" statement that the '126 patent didn't quantify the degree of force. The District Court acknowledged that truth, but rejected the *ipse dixit* conclusion Kucklick drew from it: that the lack of quantification of force was somehow unacceptable.  Since no one contended that the patent quantified the amount of force, the truth of Kucklick's statement was unremarkable.  It was also ultimately irrelevant, because it didn't support Kucklick's "*ipse dixit*" conclusion that the patent *had to* quantify the amount of force.

### iii.    *Mitzi* confirms Fossil's defense had no merit.

The *Mitzi* case confirms that Fossil's indefiniteness defense lacked merit. (Fossil Br. 46.)  In a lawsuit brought by Romag over infringement of the same patent, during a status conference, a Southern District of New York judge quipped that the "Empire State building is rotatable in its foundation as far as you folks are concerned…if you get a big enough gorilla to grab it and twist it."  (JA1418-19.) But shortly after the offhand "gorilla" comment, the judge charged the jury with an ordinary-meaning construction of "rotatable"—one that didn't require any kind of "test." (JA404; JA413.92-.93.)

It's odd that Fossil now seeks to rely on this passing comment in *Mitzi* as proof of the reasonableness of its indefiniteness position, since Fossil conceded

below that its indefiniteness argument "was rendered moot by the [District] Court's claim construction." (JA4354.30; JA1756 ("this Court's construction of "rotatable" renders [Kucklick's statements] immaterial")). But the District Court's claim construction *simply followed the* Mitzi *claim construction, as Fossil purported to ask the District Court to do.* (JA402 (Fossil asserted that its construction "comports with the Court's construction in *Mitzi*"); JA407 (Fossil argued that Romag was collaterally estopped from challenging that construction). In other words, the claim construction that Fossil sought mooted its own claim of indefiniteness.[15]

---

[15] Fossil's advocacy around *Mitzi* was disingenuous. Because *Mitzi* had been affirmed by this Court, *Romag Fasteners, Inc. v. Mitzi Int'l Handbag & Accessories, Ltd.*, 168 F. App'x 425 (Fed. Cir. 2006), Fossil sought to give *the appearance* that its construction followed *Mitzi. See Miken Composites, L.L.C. v. Wilson Sporting Goods Co.*, 515 F.3d 1331, 1338 n.* (Fed. Cir. 2008) (*stare decisis* considerations for claim construction).

But Fossil's proposed claim construction actually differed from the *Mitzi* construction. There, the claim construction stated that the pair legs could not be "rigidly secured," and that it wasn't "if it does not resist rotation." (JA404.) In its proposed claim construction, Fossil sought to effectively turn this latter phrase into "the pair of legs is not rigidly secured *only if* it does not resist rotation." Fossil sought to accomplish this by proposing a construction "capable of being rotated and not rigidly secured, i.e. does not resist rotation." (JA402.) Fossil thus proposed equating "not rigidly secured" with "does not resist rotation." That equation would transform *one possible way* of infringing contemplated by *Mitzi*— where the legs do not resist rotation—into the *only* way of infringing.

The District Court rejected this argument and instead followed the *Mitzi* construction. (JA1682.) Fossil's dubious claim construction position—and indefiniteness argument—depended on convincing the District Court that it would be following *Mitzi* when it would actually be departing from *Mitzi* by limiting infringement to situations where the legs do not resist rotation. The sleight didn't

> **iv.    The *Nautilus* standard does not make Fossil's indefiniteness position any more reasonable.**

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) didn't change the law in a way that would make Fossil's indefiniteness argument any more plausible or less frivolous. (Fossil Br. 44.)

The summary judgment ruling stated that "rotatable" would require a test *if* "persons in the relevant field considered the choice of test to be important" (JA1753 (citing *Marley Mouldings Ltd. v. Mikron Indus., Inc.*, 417 F.3d 1356 (Fed. Cir. 2005).)  In other words, the District Court acknowledged that definiteness depends on what a person having ordinary skill in the art considers relevant.  That standard is materially identical to the *Nautilus* standard. *See Nautilus*, 134 S. Ct. at 2129 (noting that a patent is definite when, "viewed in light of the specification and prosecution history, [it] inform[s] those skilled in the art about the scope of the invention with reasonable certainty.").

Indeed, definiteness has long turned on "whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986).  "*Nautilus* did not change [that] principle[ ]." *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015)

---

work: the District Court followed *Mitzi*, "render[ing] moot" Fossil's near-frivolous indefiniteness argument. (JA4354.30.)

(Moore, J., concurring).  *See, e.g.*, *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 432 (Fed. Cir. 2016) ("a PHOSITA, reading the claims in light of the specification, would be reasonably certain as to the scope of the invention. The challenged claim language . . . is sufficiently definite under the *Nautilus* standard.").

The summary judgment ruling also acknowledged that a test for "rotatable" would be necessary, under *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332 (Fed. Cir. 2003), only if "a measurement was required by the claim in question and the different methods of measurement yielded different results" (JA1752.)  After *Nautilus*, this Court has continued to hold claims indefinite under this same, unchanged standard, requiring a test *where competing measures yield different results*.  *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 634-35 (Fed. Cir. 2015), *cert. denied*, No.15-1160, 2016 WL 1059925 (U.S. May 23, 2016); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015).  This Court hasn't suggested—and Fossil hasn't even argued on appeal—that *Honeywell* has any application where a claim, as here, does *not* call for a measurement.

Fossil came forward with nothing (except Kucklick's *ipse dixit*) to explain why a person skilled in the art would need a test to define "rotatable." If anything, Fossil should have pulled no punches under the pre-*Nautilus* "insolubly

ambiguous" standard.  But even now Fossil makes no effort to explain how its motion would have turned out differently under *Nautilus*.

> **v.    Fossil's decision to move for summary judgment on indefiniteness shows how far it pushed its scorched earth tactics, not how reasonable it was.**

Fossil contends that the mere act of moving for summary judgment on indefiniteness means that its position couldn't have been unreasonable. (Fossil Br. at 50-51.)  But the fact that a party has filed a motion does not mean that the position it takes in the motion is reasonable. (If it did mean that, there would be no need for litigation misconduct sanctions, like Fed. R. Civ. Pro. 11 and 37.)

Fossil self-servingly asserts that it would have been "illogical" to move for summary judgment to "increase legal costs or risks with a defense it knew to be baseless." (*Id.* at 50.) But it's equally plausible that Fossil's real "logic" was the strategy of a far larger defendant, caught red-handed infringing a smaller company's IP, choosing to attack the opponent's core business asset—the patent—with a series of scorched-earth defenses that it knew stood very little chance of doing anything except driving up costs and potentially scaring off  the much-smaller plaintiff. That is what the District Court found *actually* occurred, and Fossil's abstract speculations (lacking any citations) about other ways of interpreting its actions come nowhere near establishing clear error.

Fossil also blames Romag for not filing its own summary judgment motion, implying that Romag must not have thought Fossil's position was frivolous. (Fossil Br. 50-51.)  But unlike Fossil, Romag didn't seek to drive up fees. Of the invalidity defenses raised in the Kucklick report, indefiniteness looked like the weakest. (JA963-64.)  Instead of moving for summary judgment, Romag simply decided to move to preclude Kucklick from testifying to his unsupported conclusions. (JA1444-45; JA1671.006) Romag's motion to preclude was a straightforward and cost-effective way to do away with that part of his opinion.

It came as a surprise when, on the day summary judgment briefs were due (JA183), Fossil based its motion on Kucklick's indefiniteness opinion.  Although too late to cross-move for summary judgment, Romag, in opposition, sought not just a denial of Fossil's motion, but also an affirmative order deeming the patent definite, which would be tantamount to summary judgment for Romag. (JA1594.) Romag has been unwavering—and correct—in showing that Fossil's indefiniteness defense lacked all merit.

## 2. The District Court didn't clearly err in finding that Fossil didn't withdraw its remaining invalidity defenses until after trial.

### a. Fossil chose not to withdraw its remaining invalidity defenses.

The District Court correctly found, as a factual matter, that Fossil didn't withdraw its invalidity defenses until after trial, requiring Romag to prepare witnesses and documents for these defenses and to put on testimony regarding the

patent's validity.  At a court conference six weeks before trial, on February 12, 2014, Romag's counsel made clear that it needed to know whether Fossil was pursuing its invalidity defenses, but Fossil's counsel "refused to answer saying he'll determine it at trial."  (JA2094.)  As Romag's counsel put it, "This is not a guessing game." (JA2095.) But Fossil was cagey in response, promising only that it would *consider* stipulating to the removal of the defenses.  (JA2096; JA2098 ("I think we might be able to stipulate something . . . on validity, I don't know, I have got to recircle back with all of the defendants . . . .").) But Fossil never did stipulate to anything.

On March 5, 2014, less than three weeks before trial, Fossil edged closer, but still refused to be definitive: "*At this point*, your Honor, we are not going to assert those [invalidity] defenses."  (JA2107 (emphasis supplied).) The District Court correctly observed that this statement was the first "indication of [Fossil's] intent not to pursue" the invalidity defenses.  (JA6.)  But that's all it was – *an indication* – not an actual abandonment of the defenses.  The District Court recognized that Fossil's carefully chosen words left room to re-assert the invalidity defenses *at a later point*, presumably after Romag put on its case-in-chief.

Fossil notes three other "indications" of withdrawal.  (Fossil Br. 20-23.) None offered more than a hint. First, Fossil's February 10 written submissions

couldn't have adequately signaled withdrawal because two days later Fossil refused to state whether it had withdrawn the defenses. (JA2098.)

Second, at the March 18 status conference discussion about prior-art exhibits that Fossil refused to withdraw from its exhibit list, while the District Court stated that "we clarified in our last hearing that there's no invalidity defense being advanced" (JA2255), that referred to Fossil's prior statement that it wasn't advancing the defenses "at this point," which is all that had been settled at the March 5 hearing, and despite that passing comment, Fossil continued to keep the prior-art documents on its exhibit list, contending that they would be admissible under other (non-invalidity-related) grounds. Fossil was trying to keep its options open, keeping the documents on the exhibit list in case it decided "at [a later] point" to advance the invalidity arguments. Fossil's manner of litigating the course throughout the proceedings up to that point made that possibility very real.

Third, while Fossil's March 20 submission to the District Court didn't mention invalidity (JA1911-65), that lack didn't indicate a withdrawal of the invalidity defenses any more than the lack of mention in its February 10 submission had indicated a withdrawal; two days after the February 10 submission Fossil refused to say it had withdrawn the defenses, and there was no reason to think that the March 20 submission's silence conveyed any more than the earlier submission's silence.

District courts have considerable discretion in interpreting the meaning of such events precisely because they see and hear first-hand not just the nuance and tone with which words were spoken, but also how multiple events in the course of litigation connect to each other. "Questions of misconduct often involve the tone and tenor of advocacy, rather than the literal words of the advocate. In such instances, a cold printed record cannot fully convey the aspects of conduct that a trial court might find egregious." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1468 (Fed. Cir. 1997).

The District Court concluded that the invalidity defenses remained a real threat until formally withdrawn. The District Court acted well within its discretion in recognizing, as a matter of fact, that Fossil left the door open to raising those defenses later. Indeed, emphasizing that the door was still open, Fossil left Kucklick on its witness list. (JA6.) Fossil comes nowhere near establishing that the District Court committed clear error.

**b. Fossil's invalidity defenses—which it later admitted were a "waste of everybody's time"—required Romag to prepare and present evidence of validity and infringement.**

Even if Romag had been willing to gamble that Fossil's March 5 statement ("at this point") represented some kind of withdrawal—despite the District Court's factual finding that it didn't—it came years into the litigation, far too late to have any serious effect on Romag's trial preparation and strategy. Romag's expert,

Schwarz, was already standing by and prepared to testify in rebuttal to Fossil's invalidity defenses. (*See* JA1216-29.)

Faced with the fact that the invalidity defenses hadn't been withdrawn, Romag did what it had to do to protect its core business asset. To be sure, the patent had a presumption of validity, but Fossil's invalidity expert—conspicuously still on Fossil's witness list—might be able to rebut that presumption. If Romag offered no affirmative evidence of validity, it could lose its patent. Instead of taking that enormous risk, Romag called Schwarz to testify that Fossil infringed the '126 patent. (JA3135-55.)

Schwarz's infringement testimony was shaped by Romag's knowledge that Kucklick could testify as to invalidity and non-infringement. Indeed, if Romag had known that Fossil wasn't going to contest validity, Romag wouldn't have retained Schwarz, and instead would have relied on Reiter, who could have established infringement by showing that Fossil's snaps infringed each element of the '126 patent claims. Even though Fossil kept him on its witness list, it never called Kucklick to testify, choosing to press its "phantasmagorical" fact theory: that the snaps on Fossil bags were somehow authentic Romag snaps. *Cf. Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1385 (Fed. Cir. 2008) (patent challenger's "shifting theory of obviousness" provided evidence of litigation misconduct warranting an award of attorneys' fees).

Reiter testified as to validity. He noted that his invention was a "better mousetrap" that improved on the prior art. (JA2549.) He testified that the invention "improve[d] both…the way the magnetic circuit worked and the manufacturability of the product. (JA2550.) Whereas "earlier patents required that the central pin be solid…we made ours hollow…to…help the efficiency of our manufacturing and assembly process." (JA2555.) Reiter also explained that his invention was enormously successful, and that Romag had produced 57 million of its snaps. (JA2575.)

Though not highly technical, Reiter's testimony went directly to the issues of non-obviousness, non-anticipation, failure of others, and commercial success. It also laid the foundation for rebuttal testimony on validity that Schwarz would need to present if Fossil introduced Kucklick. As the District Court knew, Schwarz was prepared to testify on key validity issues: that no prior snap had a hole through its central pin, and that incorporating a hole in the central pin wouldn't have been obvious to a person skilled in the art. (JA1218-19; JA1223-28.) Schwarz would have testified that the hollow central pin set the Romag snap apart from other magnetic snaps. (*See* JA243 (summary of invention: "a magnetic snap fastener…with a hole therethrough that may be used to support the closure half during a coating process [etc.]").)

As it turned out, Reiter's "better mousetrap" testimony—and his and Schwarz's preparation to rebut Kucklick's invalidity analysis—was for naught. Though Fossil had spent years dangling over Romag the prospect of destroying its primary business asset, it had no intention of actually arguing invalidity to the jury. The invalidity defenses were, as Fossil finally admitted on the eve of trial, "a waste of everybody's time."  (JA2098.)

The District Court heard that admission and looked in the eyes of Fossil's counsel when it was made. She heard Fossil's counsel's promise to try to enter into a stipulation and knew it never happened. She heard Fossil's counsel's statement about what Fossil planned "at *this* point." She observed their demeanor day in and day out, as they argued motions and examined witnesses. All told, she observed Fossil's litigation positions and tactics for eight months, across a wide range of contexts. And she concluded that Fossil had deliberately played chicken, raising invalidity defenses to threaten the much-smaller Romag with the loss of its core business asset, even though Fossil never intended to take those invalidity arguments to trial. That was a significant factor in the District Court finding, as a matter of fact, that this case was "exceptional."

Fossil cites several district court cases that have noted that a litigation position isn't necessarily frivolous or vexatious merely because it's withdrawn before trial. (Fossil Br. at 54-56.) In all of those cases, the district court assessed

the conduct of the litigants before it, made factual findings as to the frivolousness or vexatiousness of the positions, and exercised its discretion to determine, under the totality of the circumstances, whether it was an exceptional case.[16]  That is exactly what the District Court did here. On the facts of those cases, as found by those district courts, the cases weren't exceptional; on the facts as found by the District Court here, this case was exceptional. Fossil deliberately played chicken with an invalidity defense in order to try to bully an opponent into giving up a legitimate infringement claim.

### c. Romag accurately represented the effect of Fossil's failure to withdraw its invalidity defenses until after trial.

Still unwilling to accept responsibility for maintaining theories that were a "waste of everyone's time" and "bordered on frivolous," and for having gone to trial with a theory against which there was "overwhelming" evidence," Fossil tries to turn the tables. (Fossil Br. 29-30.) Just as it refused to accept responsibility for trafficking in counterfeits and infringing patents—falsely blaming Romag for

---

[16] Fossil's citation to *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283 (Fed. Cir. 2015), offers no support. The panel there used a mixed substantial-evidence/de novo standard of review to overturn a district court finding on Section 284 enhancement-of-damages, *id.* at 1299-1302, but the *en banc* court now has the case, 805 F.3d 1382 (Fed. Cir. 2015), having held the relevant part of a petition for rehearing *en banc* in abeyance pending the recent decision in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, No.14-1513, 2016 WL 3221515, at *10 (U.S. June 13, 2016). *Halo* overturned the mixed substantial-evidence/de novo standard, replacing it with a straightforward abuse-of-discretion standard.

having secured an invalid patent—Fossil again tries to turn the tables, asserting that it was actually *Romag* that misled the District Court (Fossil Br. 29-30). But despite the nicely-formatted table designed to draw attention to what it claims were deceptive comments, all of the statements that Fossil criticizes were *true*, as the previous sections show. Fossil did not withdraw its invalidity defenses until after testimony was complete, even though it knew they were borderline frivolous. And Romag offered validity testimony at trial: Reiter testified on validity and infringement and Schwarz testified on infringement (JA2555-59; JA2644-49; JA3135-55), knowing that Kucklick was still on the witness list and that Fossil hadn't withdrawn its invalidity defenses (JA2094-95), which it didn't withdraw until after trial.  (JA.6.)

The District Court—having heard firsthand from Fossil's counsel—knew Fossil never really committed to withdrawing its invalidity defenses until after trial.  *See Nilssen v. Osram Sylvania, Inc.,* 528 F.3d 1352, 1359 (Fed. Cir. 2008) (deferring to assessment of "litigation misconduct when the litigation occurred in front of the trial judge"; *Motorola*, 121 F.3d at 1468 ("this court is careful to avoid substituting its assessment of facts for those of the judge who experienced them firsthand."); *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1582, (Fed. Cir. 1992) (deferring to trial judge "who had the opportunity to

observe those intangibles missing from the appellate record"); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366-68 (Fed. Cir. 2013) (same).

Fossil's abandonment of its invalidity defenses during trial wasn't a run-of-the-mill refinement of its litigation strategy. Fossil raised this defense even though Superior admitted the snaps were unauthorized, and even though Superior had previously bought millions of authentic Romag snaps directly from Romag's authorized seller. *Kirtsaeng*, slip op. at 7-8 (district court should give substantial weight to strength of litigating positions so that "infringer with no reasonable defense has every reason to give in quickly"). As *Kirtsaeng* noted, a court "that has ruled on the merits . . . can easily assess whether the losing party advanced an unreasonable claim or defense. . . . [A] judge cannot help but consider the strength and weakness of each side's arguments." *Id*. at 9. The District Court recognized that Fossil used ultimately worthless invalidity defenses not to seek justice, but to exact pain and sow fear on a much smaller opponent.

### 3. The District Court correctly determined that considerations of compensation and deterrence support an exceptional case finding.

The District Court properly weighed the effect of Fossil's use of invalidity defenses as a bludgeon from the outset of the case, even though Fossil later admitted that those high-threat defenses were nothing but a waste of time. The District Court found, as a matter of fact, that Fossil maintained those defenses

merely as "an attempt to prolong litigation and exponentially increase the cost and risk" to Romag, for whom the '126 patent is its primary asset. (JA6.)

*Octane Fitness* held that a District Court determining whether a case is exceptional may consider "the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 134 S. Ct. at 1756 n. 6 (*quoting Fogerty*, 510 U.S. at 534 n.19). Courts interpreting *Fogerty*'s "compensation and deterrence" factor have consistently held that district courts may weigh disproportionate litigation tactics in considering an award of fees. *See, e.g.*, *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 669 F.3d 59, 64 (1st Cir. 2012) (affirming discretion in finding that fee award would deter parties "from litigating in a manner greatly disproportional to the matter at stake."); *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 595 (6th Cir. 2008) ("not an abuse of discretion for the district court to award fees . . . in the hope of motivating [a party] to litigate in a more responsible, realistic manner and to deter it from continuing to engage in questionable litigation tactics.").

Compensation and deterrence considerations "encourage[ ] parties with strong legal positions to stand on their rights and deter[ ] those with weak ones from proceeding with litigation." *Kirtsaeng*, slip op. at 7.  When a rightholder "is clearly correct, the likelihood that he will recover fees from the opposing (*i.e.*, unreasonable) party gives him an incentive to litigate the case all the way to the

end. . . . even if the damages at stake are small." *Id*. Conversely, when an

infringer "has an unreasonable litigating position, the likelihood that he will have

to pay two sets of fees discourages legal action." *Id*.

Factual findings and credibility determinations as to counsel's motivation,

including motivation in bringing motions designed to "needlessly prolong[ ] the

litigation" are reviewed for clear error only. *Monolithic Power Sys.*, 726 F.3d at

1364, 1367 (Fed. Cir. 2013); *see also Eon-Net LP v. Flagstar Bancorp*, 653 F.3d

1314, 1327 (Fed. Cir. 2011) (affirming finding that party "acted in bad faith by

exploiting the high cost to defend complex litigation to extract a nuisance value

settlement"). Rather than directly attacking those factual findings, Fossil tries to

recast them as some sort of public policy position that would hinder the

development of meritorious defenses.  (Fossil Br. 57-58.)

The District Court did not stake out some new policy position; it merely

applied *Octane Fitness*'s requirement to consider compensation and deterrence to

the facts of this case. By the time the District Court made its factual determination

that attorney's fees would serve appropriate deterrence and compensation in this

case, it knew that Fossil had never offered any more than two woefully inadequate

defenses to the patent infringement charges: a pack of scorched-earth invalidity

defenses that the District Court considered "borderline frivolous" and that even

Fossil itself admitted were nothing but a "waste of everybody's time" (JA2098),

and the fictitious "phantasmagorical" factual assertion that the snaps were really authentic Romag snaps. The District Court recognized that Fossil bore down on the "waste of everyone's time" defenses for years, not because it ever expected to win or even deemed them worth the cost of litigating, but because they threatened Romag's core business asset, putting the wronged party on the defensive.

Say what it will now about the amount of exposure Fossil itself faced (Fossil Br. 57), what Fossil actually told the District Court was that its patent exposure was only $28,000. (JA2098.)[17] The District Court didn't commit clear error in determining that Fossil maintained its "waste of everyone's time" invalidity defenses—not to stave off a $28,000 loss, but to prolong litigation and inappropriately threaten Romag.

### 4. The District Court Acted Well within Its Discretion in Weighing Fossil's Non-Willfulness and Romag's Laches.

Contrary to Fossil's assertion (at 59), the District Court didn't "refuse[ ] to consider" relevant factors when considering the totality of the circumstances. To the contrary, it expressly considered the factors that Fossil says it failed to consider: that Romag tried but failed to amend its complaint several times, and that

---

[17] To be sure, Romag sought a considerably higher recovery, but the vast majority of the higher recovery was sought for trademark violations under the Lanham Act, not the Patent Act, and Fossil's claims of patent invalidity obviously could not insulate it from responsibility for its trademark violations. The jury awarded Romag $66,372.75 for Fossil's patent infringement. (JA4304.)

Romag should have filed its (meritorious) complaint sooner and should have avoided misstatements in seeking a TRO.

The District Court explicitly reduced the fee award by more than $114,000 to account for Romag's unsuccessful motions to amend the complaint and its fees incurred in pursuing the TRO. (JA46.) In addition, the District Court reduced Romag's patent recovery by eighteen percent to account for its findings of laches (late filing) and misstatements in seeking the TRO. (JA69.) Fossil wanted Romag sanctioned further, but the District Court exercised its equitable discretion to decline that invitation to further punishment, stating clearly that "these issues were limited in scope and have already been addressed, [so there is] no need to further sanction Plaintiff by denying an award of fees in this case." (JA7.) Moreover, it was certainly not lost on the District Court that the jury found Fossil wasn't a "willful" infringer, as the District Court noted that at the very beginning of the attorney's fee award. (JA1.)[18]

While the Court sanctioned Romag for not filing a few months sooner and for conduct in connection with seeking the TRO, it recognized that Fossil had conducted far worse misconduct.

---

[18] To the extent Fossil argues (at 59) that the District Court should have considered its denial of Romag's post-trial motion, it has waived the argument, which it never presented below. *Sage Products*, 126 F.3d at 1426.

## II. The District Court Properly Exercised Its Discretion in Awarding Expert Fees.

The District Court correctly invoked its inherent power to award $54,877 to compensate Romag for its patent expert's fees. (JA37-38.) Romag had sought to recover fees expended on several expert witnesses, but the District Court denied the majority of the request, ordering only fees for the testimony of Dr. Schwarz (JA38), the expert that Romag was forced to retain to respond to Fossil's "bordered on frivolous" (JA6) argument that Romag's patent was invalid because indefinite. The District Court's limited grant of relief was well within its discretion.

A "primary aspect of [a district court's] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). "In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.,* motivated by improper purposes such as harassment or delay." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (quotation marks and citation omitted).[19] An inherent power sanction is reviewed for abuse of discretion. *Id.* at 143.[20]

---

[19] Fossil cites (at 59) an older case, *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000), where the district court relied on several improper bases to impose sanctions, but none are relevant here. One was the use of vulgarity in a letter, which the Court of Appeals found inappropriate but not sanctionable. *Id.* at 79. Notably, while the district court there had earlier found that the sanctioned party's claim couldn't succeed as a matter of law, the Second Circuit had reversed in an

Here, the District Court correctly concluded that Fossil's motion for summary judgement on the basis of indefiniteness lacked any merit.  (JA38.)  As noted above, the District Court concluded that the expert report on indefiniteness proffered by Fossil offered nothing but a recitation of basics that everyone agreed on and some tagged-on *ipse dixit* assertions. (*Supra* pp. 15-17, 42-43.) Fossil's expert report and summary judgment briefing failed to explain why a person having ordinary skill in the art would find it hard to interpret an ordinary-language term—"rotatable"—that Fossil itself had earlier argued didn't have a specialized meaning.  (*Supra* pp. 15-15, 42-43.)

Fossil took the extreme and "entirely meritless" position that the word "rotatable" was indefinite—and the patent thus invalid—for purely "improper purposes": to harass Romag and exponentially raise the stakes for a patentee whose primary asset was on the line. (JA38.)

---

earlier opinion, making plain that the sanctioned party's claim wasn't "entirely without color." *Id*. at 82.

[20] Because inherent power isn't a patent issue, it's governed by Second Circuit law. Fossil nevertheless cites *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374 (Fed. Cir. 1994), for the proposition that an inherent-power sanction is appropriate only if a case is "sufficiently beyond 'exceptional.'" *Id*. at 379.  (Fossil Br. 62.) Yet this Court has more recently held that even where a litigant's conduct does not "amount to fraud, courts may use sanctions in cases involving bad faith that cannot be otherwise reached by rules or statutes." *Takeda*, 549 F.3d at 1391 (affirming award of expert witness fees under inherent power). *Takeda* does not apply a "sufficiently beyond" standard.

Other than repeating the standard and conclusorily asserting that its conduct didn't fall below it, Fossil offers only a single argument: that a later district court judge shouldn't have based a sanctions order on a ruling by an earlier district court judge in the same case. It would be an odd rule of law indeed if a party could be insulated from the cost of its own bad conduct merely the happenstance of a case being transferred to another district court judge. Fossil offers no authority for that proposition, which would leave the victims of "fraud, abuse of the judicial process, or bad faith," *Takeda*, 549 F.3d at 1391, victimized again merely because the judge who oversaw the bad conduct was later replaced by another judge.

### III.    The Supplemental Fee Award Properly Reflected Romag's Successful Fee Petition.

Fossil does not contend that the District Court erred in its supplemental award to Romag for attorney's fees incurred in litigating the initial fee petition and other post-trial work, except to say that if this Court finds that the District Court's primary fee award was "clearly erroneous," then the supplemental fee award should be further reduced on remand. (Fossil Br. at 63.)

To be sure, Fossil would have the right to argue for such a reduction. However, as Fossil recognizes (*id.*), the District Court granted Romag fees not just under the Patent Act, but also under CUTPA. The District Court found—and Fossil does not contest—that the "CUTPA claim was so intertwined with [the] other

causes of action that the vast majority of its costs and fees cannot be apportioned between the claims at issue in this case." (JA13-14 (explaining Connecticut rule); JA32.) Any reduction on remand would be subject to that same rule.

Moreover, if this Court were to agree with Romag that *Octane Fitness* sets the standard for attorney's fee awards for both Patent Act and Lanham Act claims (*see* Cross-appeal Pt. II, *infra*), then the District Court would likewise have to adjust the fee award, granting the fees "incurred solely in relation" to work done on its Lanham Act claim, which were previously denied (JA14, 32-33). Because the District Court determined that the reasonableness of a fee award depends on the degree of success obtained (JA48.004), success by Romag on its cross-appeal on attorney's fees under the Lanham Act would also require the District Court to adjust upward the supplemental fee.  (JA53.)

## **ROMAG'S CROSS APPEAL**

I.   **The Substantive Weakness of Fossil's "Phantasmagorical" Factual Theory Could Alone Have Supported a Finding That This Was an "Exceptional" Case.**

The District Court ruled that, when considering whether this was an exceptional case, it couldn't consider the fact that "Fossil's argument that the snaps used in its handbags were genuine [Romag] snaps lacked any evidentiary support at trial." (JA4.) This was because it had denied (without prejudice) Romag's Rule 50(a) motion for judgment on this issue, and Second Circuit law from another context states that a claim shouldn't be considered "frivolous, groundless, or unreasonable" if it has survived a motion for judgment as a matter of law. (JA5.) The court thus concluded that even though "the evidence that the Fossil handbags produced by Superior [Fossil's Chinese manufacturer] contained non-genuine snaps was overwhelming," under Second Circuit law Fossil's argument wasn't, by itself, "so frivolous or groundless as to justify an award of fees." (*Id.*)  On that point, the District Court erred for two reasons.[21]

---

[21] The Court wouldn't need to consider this argument if affirming the judgment below for the reasons set out in Romag's response to Fossil's appeal. This issue thus constitutes a conditional cross-appeal. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782, 791 (Fed. Cir. 2016) (describing as "a conditional cross-appeal" Fossil's challenge to jury instructions, which would have had to be reached only if the Court had reversed on the main appeal). By contrast, the second cross-appeal issue is not conditional.

First, the District Court applied the wrong law. Issues that are "unique to patent law" are subject to Federal Circuit law. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006). The Second Circuit precedent cited by the District Court does not involve Section 285 of the Patent Act—and couldn't, given this Court's exclusive jurisdiction over patent-related appeals. The relevant law isn't Second Circuit precedent from other contexts,[22] but *Octane Fitness*, which unequivocally states that district courts evaluating whether a case is extraordinary should consider "the substantive strength of a party's litigating position." *Octane Fitness*, 134 S. Ct. at 1751.

Under *Octane Fitness*, conduct that isn't "independently sanctionable" can still warrant attorney's fees. 134 S. Ct. at 1756.  For instance, there are times when "a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id*. at 1757; *accord Lumen View Tech.*, 811 F.3d at 483; *cf. also Kirtsaeng*, slip op. at 1 (district court "should give substantial weight to the objective reasonableness of the losing party's position").

Second, even if Second Circuit law from outside the patent context somehow applied to a Section 285 exceptionality determination, the court below

---

[22] *See* JA5 (*citing LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 771 (2d Cir. 1998) (holding, in context of a civil rights discrimination claim, that "a claim [may not] properly be deemed groundless where the plaintiff . . .  has presented sufficient evidence at trial to prevent the entry of judgment against him as a matter of law.").

shouldn't have refused to consider the overwhelming weakness of Fossil's theory merely because it had denied the Rule 50(a) motion. That is because the District Court didn't deny the motion on the merits—i.e., after considering the evidence—but merely denied it without prejudice to renew it later. (JA2425-26.) The court forthrightly acknowledged that it wasn't *analyzing the evidence* to determine whether Fossil had put forward any facts allowing it to go to trial: "We do not have to dissect the evidence now, that's the whole purpose of denying the motion without prejudice." (*Id.*)  The earlier denial without prejudice of the Rule 50(a) motion, which explicitly avoided analyzing the evidence, didn't neuter the District Court's later finding of the "overwhelming" (JA5) weakness of Fossil's position.

## II.    The Octane Fitness Standard Should Have Been Used to Determine Whether This Was an "Exceptional" Case Under the Lanham Act.

The District Court erroneously ruled that, as a matter of law, this couldn't be an "exceptional case" under the Lanham Act because the jury found that Fossil's infringement wasn't "willful."  The Patent Act and the Lanham Act each state that a court "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a); 28 U.S.C. § 285. Despite being identical, the District Court concluded that this language means one thing in the Patent Act and another in the Lanham Act.

The District Court, relying on pre-*Octane Fitness* cases from Second Circuit, held that the Lanham Act rigidly requires "fraud or bad faith, or willful

infringement." (JA7-8) Those pre-*Octane Fitness* cases are no longer good law.
The same statutory language, explicated by *Octane Fitness*, has the same meaning
in both statutes.

The Second Circuit hasn't yet addressed whether the *Octane Fitness*
standard applies to the Lanham Act. *See Penshurst Trading Inc. v. Zodax LP*,
No.14-CV-2710 RJS, 2015 WL 4716344, at *2 (S.D.N.Y. Aug. 7, 2015). Where
"the regional circuit court hasn't specifically spoken on the issue, [this Court]
reasonably predict[s] how that court would decide the issue." *TechSearch, L.L.C. v.
Intel Corp.*, 286 F.3d 1360, 1378 (Fed. Cir. 2002). Several factors confirm that the
Second Circuit would recognize that the *Octane Fitness* standard applies to an
"exceptional case" determination under the Lanham Act.

*First*, *Octane Fitness* itself relied on a case interpreting the Lanham Act for
support for its reading of the term "exceptional."  Characterizing "the term
'exceptional' in the Lanham Act[ ] as "identical" to that in the Patent Act, the
Supreme Court cited *Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant,* 771
F.2d 521, 526 (D.C. Cir. 1985) for the proposition that "exceptional" simply means
"uncommon" or "not run-of-the-mill." *Octane Fitness*, 134 S. Ct. at 1756.  The
Court also cited *Noxell* when stating that "Something less than 'bad faith' . . .
suffices to mark a case as 'exceptional.'" *Id*. at 1757 (*quoting Noxell*, 771 F.2d at

526). The Supreme Court clearly approved of *Noxell* (which had been authored by then-Judges Ginsburg and Scalia).

*Second*, *Octane Fitness*, in describing the proper analysis under Section 285 repeatedly cited to the "comparable" context under the Copyright Act. *Octane Fitness*, 134 S. Ct. at 1756, 1758; *cf. Kirtsaeng*, slip op. at 3 (Copyright Act "grants courts wide latitude to award attorney's fees based on the totality of circumstances in a case"). The Copyright Act's attorney's fee provision does not even use the word "exceptional." 17 U.S.C. § 505.  If the Copyright Act's very different language is "comparable" to the Patent Act, then the *identical* language of the Lanham Act is certainly comparable.

*Third*, all three Courts of Appeals that have analyzed the issue have concluded that *Octane Fitness* applies to the Lanham Act. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314-15 (3d Cir. 2014) (*Octane Fitness* governs "exceptional case" standard under Lanham Act); *Georgia-Pac. Consumer Products LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015) (same); *Baker v. DeShong,* No.14-11157, 2016 WL 2342963, at *4 (5th Cir. May 3, 2016) (same).[23]

---

[23] In *Fifty Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1078 (9th Cir. 2015), the Ninth Circuit, affirming an award of attorney's fees to a trademark holder, applied its old Lanham Act fees standard after *Octane Fitness*—but without addressing *Octane*. A later panel considered itself bound by *Fifty Six*'s recitation of the old standard, but noted that the district court ruling would pass muster under *Octane. SunEarth, Inc. v. Sun Earth Solar Power Co.*, No.13-17622, 2016 WL

The reason for that is simple: "statutes containing similar language and having a similar underlying purpose should be interpreted consistently," and the Lanham Act and Patent Act have identical relevant language. *Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 318 (6th Cir. 2015) (remanding to district court to "assess the applicability of *Octane Fitness*" to an award of fees under the Lanham Act) (citation omitted). The Second Circuit wouldn't become the first circuit to review the identical relevant language and hold that *Octane Fitness* does not apply to the Lanham Act.

Because the District Court explicitly "conclude[d] that the case is 'exceptional'" under the "standard announced in *Octane Fitness*" (JA9) and because *Octane Fitness* interprets statutory language identical to the Lanham Act fee provision, this Court should reverse the denial of Lanham Act fees.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Romag requests an order affirming the District Court's award of attorneys' fees under the Patent Act, and a remand to the District Court to award the amounts previously deducted for work solely attributable to the Lanham Act.

---

2993958, at *1 (9th Cir. May 24, 2016). The Ninth Circuit has never analyzed the effect of *Octane Fitness* on the Lanham Act attorney's fees standard.

Respectfully submitted,


**PLAINTIFF/APPELLEE/
CROSS-APPELLANT
ROMAG FASTENERS, INC.**

Dated: June 20, 2016


By:\_\_\_ /s/Jonathan M. Freiman
       Jonathan Freiman
       WIGGIN AND DANA LLP
       One Century Tower
       P.O. Box 1832
       New Haven, CT 06508-1832
       (203) 498-4400
       (203) 782-2889 (fax)
       jfreiman@wiggin.com

       Norman H. Zivin
       Tonia A. Sayour
       COOPER & DUNHAM, LLP
       30 Rockefeller Plaza
       New York, NY 10112
       (212) 278-0400
       (212) 391-0525 (fax)
       nzivin@cooperdunham.com
       tsayour@cooperdunham.com

       *Its Attorneys*

**ADDENDUM**

**i**

## TABLE OF CONTENTS

**Page**

Ruling on Motion for Attorney's Fees, dated
   August 14, 2014...................................................... ADD-1

Ruling on Plaintiff's Motions for Attorneys' Fees,
   dated September 30, 2015..................................... ADD-20

Ruling on Plaintiff's Supplemental Motion for
   Attorneys' Fees, filed March 28, 2016 ................. ADD-49

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTERNERS, INC.,<br>  *Plaintiff*,<br>   *v.*<br>FOSSIL, INC., *et al.*,<br>  *Defendants*. | Civil No. 3:10cv1827 (JBA)<br><br><br>August 14, 2014 |

**RULING ON MOTION FOR ATTORNEY'S FEES**

On April 3, 2014, after a seven-day trial, a jury returned a verdict finding Defendants Fossil, Inc. and Fossil Stores I, Inc. ("Fossil") liable for trademark infringement, false designation of origin, state common law unfair competition, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").   (*See* Jury Verdict [Doc. # 417].)   The jury also found Fossil and Macy's, Inc. and Macy's Retail, Inc. ("Macy's") liable for patent infringement.   (*Id.*)   The jury returned a verdict of no liability for the remaining defendants, and found that neither Fossil nor Macy's had willfully infringed Plaintiff Romag Fasteners, Inc.'s ("Romag") patent or trademark.   (*Id.*)   The jury made an advisory award of $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory and determined that 99% of Fossil's profits were attributable to factors other than its infringement of the ROMAG mark.   (*Id.*)   Finally, the jury awarded a reasonable royalty of $51,052.14 against Fossil and $15,320.61 against Macy's for patent infringement.   (*Id.*)

The Court then held a two-day bench trial on April 8 and 9, 2014 to address the remaining equitable issues in the case.   The Court ultimately concluded that Defendants had failed to establish their equitable defenses of unclean hands or breach of the duty to

mitigate, but that they had sustained their burden with respect to the equitable defense of laches, and reduced the jury's award of a reasonable royalty by 18% to an award of $41,862.75 against Fossil and an award of $12,562.90 against Macy's. (*See* Findings of Fact and Conclusions of Law [Doc. # 471] at 40–41.) The Court also imposed sanctions on Plaintiff for its conduct in seeking a Temporary Restraining Order ("TRO") in this case, holding that Plaintiff may not recover its attorney's fees in connection with the TRO proceedings. (*Id.* at 40.) Finally, the Court held as a matter of law that because the jury found that Fossil's trademark infringement was not willful, Romag was not entitled to an award of Fossil's profits. (*Id.* at 40–41.) The Court also granted Plaintiff's post-trial motion for entry of judgment as a matter of law against Macy's with respect to patent infringement. (*See* Ruling on Post-Trial Motions [Doc. # 480] at 23–24.)

Plaintiff now moves [Doc. # 450] for an award of approximately $3 million in attorney's fees and costs pursuant to the Patent Act, the Lanham Act, and CUTPA. Plaintiff also moves [Doc. # 378] for sanctions in the form of its fees and costs incurred in conducting several depositions on the eve of trial. Defendants oppose both motions, arguing that Romag is not entitled to sanctions, is not entitled to recover its costs and fees under any of the cited statutes, and in the event the Court does find that Plaintiff is entitled to a fee award, that Romag's requested fees are unreasonable and should be substantially reduced. In response to Defendants' arguments, Plaintiff subpoenaed Defendants' billing records, pursuant to *Serricchio v. Wachovia Securities, LLC*, 706 F. Supp. 2d 237 (D. Conn. 2010). Defendants have objected to the subpoenas, and Plaintiff also moves [Doc. # 466] to compel Defendants' responses. On June 10, 2014, this Court held a status conference to resolve the potential scheduling issues raised by Plaintiff's motion to compel. The Court ordered the parties to fully brief the issue of entitlement to

2

attorney's fees, and stayed all deadlines with respect to the motion to compel pending a ruling on that issue.  (*See* Endorsement Order [Doc. # 468].)  The Court also stayed the deadline for Plaintiff's reply to Defendants' substantive objections to its requested fees and costs.  (*Id.*)  Therefore, this opinion will address only the issue of Plaintiff's entitlement to recover its fees under the Patent Act, the Lanham Act, and CUTPA, in addition to Plaintiff's motion for supplemental relief.  Plaintiff's motion to compel and Defendants' substantive objections to Plaintiff's claimed fees and costs will be addressed in a separate opinion.

For the reasons that follow, the Court concludes that Plaintiff is entitled to recover its reasonable attorney's fees and costs in this case pursuant to the Patent Act and CUTPA.  Additionally, Plaintiff's motion for sanctions will be denied.

## I.    Discussion

Plaintiff, having prevailed on each of its claims against Fossil and on two of its claims against Macy's, now moves for an award of attorney's fees pursuant to the Patent Act, the Lanham Act, and CUTPA.  Defendants oppose Plaintiff's motion, arguing that Plaintiff is not entitled to an award of fees and costs under any of those statutes.

### A.    The Patent Act

The Patent Act provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party."  28 U.S.C. § 285.  In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), the Supreme Court recently clarified the standard for awarding attorney's fees under this provision.  The Court rejected the rigid standards set forth by the Federal Circuit and held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the

3

ADD-3

unreasonable manner in which the case was litigated.  District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Id.* at 1755.  For example, the Court noted that "a district court may award fees in the rare case in which a party's unreasonable conduct— while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees."  *Id.* at 1757.  Furthermore, "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award."  *Id.*  The Supreme Court also noted that the non-exclusive list of factors it identified for awarding fees under the Copyright Act would be useful in a court's case-by-case analysis under the Patent Act.  *Id.* at 1755 n.6.  These factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* (internal citations and quotation marks omitted).  Finally, the Court held that "[s]ection 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden."  *Id.* at 1758.

Plaintiff argues that this case is an "exceptional" case as the Supreme Court has recently defined that term.  Specifically, Plaintiff argues that Fossil failed to withdraw its meritless invalidity defenses before trial and that Fossil's argument that the snaps used in its handbags were genuine lacked any evidentiary support at trial.  Finally, Plaintiff argues that Fossil's entire litigation strategy was vexatious, in that Fossil's invalidity challenge jeopardized Romag's primary business asset in an attempt to intimidate Romag into relinquishing its infringement claims.

With respect to what Plaintiff characterizes as Defendants' groundless argument that the snaps on the accused handbags were genuine, Defendants assert that because the

4

ADD-4

Court denied Plaintiff's Rule 50(a) motion on this issue, their argument regarding whether or not the snaps were genuine cannot have been so frivolous as to merit an award of attorney's fees. The Second Circuit has recognized that "[c]ertain types of judicial rulings strongly indicate that a plaintiff's claim should not be deemed frivolous, groundless, or unreasonable. . . . [A] claim [may not] properly be deemed groundless where [a party] has made a sufficient evidentiary showing to forestall summary judgment and has presented sufficient evidence at trial to prevent the entry of judgment against him as a matter of law." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 770–71 (2d Cir. 1998). Thus, although the evidence that the Fossil handbags produced by Superior contained non-genuine snaps was overwhelming, this Court's ruling denying Plaintiff's Rule 50(a) motion precludes a finding that Defendants' argument was so frivolous or groundless as to justify an award of fees.

With respect to Defendants' invalidity claims, Defendants argue that their indefiniteness defense was largely tied to their proposed claim construction, and that because Judge Young[1] did not hold *Markman* proceedings prior to the summary judgment deadline, it was not inappropriate for Defendants to continue to pursue that argument at the summary judgment phase of the case. Furthermore, Defendants argue that they announced their intent not to pursue their other invalidity defenses at the pre-trial conference, and thus Plaintiff need not have presented evidence with respect to those defenses at trial. While Judge Young did hold that his claim construction ruling rendered Defendants' expert's opinion "immaterial," he also characterized that opinion as "nothing more than an *ipse dixit*," which could not have legally sufficed as substantial evidence of

---

[1] This case was assigned to multiple judges before it was transferred to the undersigned for trial. Judge Young of the District of Massachusetts presided over the claim construction and summary judgment proceedings in this action.

ADD-5

invalidity.  (*See* Ruling on Summ. J. [Doc. # 260] at 57.)  Judge Young further likened Defendants' evidence in support of its indefiniteness defense to a "woefully inadequate showing" and granted summary judgment *sua sponte* in favor of Plaintiff on the claim. (*Id.* at 54.)  Based on the tenor of Judge Young's opinion, it is clear to this Court that Defendants' argument with respect to their patent invalidity defense of indefiniteness bordered on frivolous.

With respect to Defendants' other invalidity defenses, Defendants gave no indication of their intent not to pursue those claims until the pre-trial conference:

| | |
|---|---|
| The Court: | Two question areas.   One is the defendant—are the defendants asserting the affirmative defenses to the patent claim of obviousness and prior art? |
| Mr. Cass: | At this point, your Honor, we are not going to assert those defenses. |

(Pre-Trial Tr. Vol. I [Doc. # 359] at 7; *see also id.* at 90 ("I think we indicated that validity defenses would not be asserted.").)  Defendants presented no evidence in support of their remaining invalidity defenses at trial, but did not formally withdraw these defenses with prejudice until after trial, when Romag moved for judgment as a matter of law.  (*See* Charge Conf. Tr.  [Doc. # 439] at 45.)  Defendants also maintained their patent expert on their witness list throughout trial, which Plaintiff argues necessitated its presentation of evidence with respect to patent validity in its case-in-chief.  The '126 patent represents Romag's principal business asset, and thus Romag's decision to continue to present evidence to counter Defendants' invalidity defenses until the claims were formally withdrawn with prejudice was entirely foreseeable.

Although Defendants' arguments with respect to non-infringement were not entirely groundless, the Court concludes that Defendants' pursuit of its indefiniteness invalidity defense, and its failure to formally withdraw its remaining invalidity defenses

<div align="center">6</div>

<div align="center">ADD-6</div>

until after the close of evidence weigh in favor of an award of fees in this case.
Furthermore, the Court notes that this case raises special concerns regarding
compensation and deterrence of patent infringement. Although snap fasteners represent
a minute portion of Defendants' costs and profits, the '126 patent is Plaintiff's primary
business asset. Thus, there is a risk that plaintiffs similar to Romag could be discouraged
from bringing claims that may garner only small awards but are nonetheless vital to the
survival of their businesses where defendants, as was the case here, aggressively pursue
invalidity counterclaims in an attempt to prolong litigation and exponentially increase the
cost and risk of pursuing a lawsuit. Therefore, the Court concludes, based on the totality
of the circumstances and a consideration of the factors suggested in *Octane Fitness*, that
this is an "exceptional" case within the meaning of the Patent Act and that Plaintiff is
entitled to recover its reasonable attorney's fees under that statute. Defendants urge this
Court to exercise its discretion not to grant Plaintiff's fee petition even if it concludes that
this is an exceptional case, arguing that Plaintiff's laches and its conduct in pursuit of the
TRO in this case militate against such an award. However, the Court has already ordered
that Plaintiff may not recover its fees in connection with the TRO and reduced the jury's
reasonable royalty award in light of Plaintiff's laches. Because these issues were limited in
scope and have already been addressed, the Court sees no need to further sanction
Plaintiff by denying an award of fees in this case.

## B.    The Lanham Act

The Lanham Act provides that "in exceptional cases [the court] may award
reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Second Circuit
has held that this provision "allows recovery of a reasonable attorney's fee only on
evidence of fraud or bad faith." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83,

7

111 (2d Cir. 2012) (internal citations, quotation marks, and alterations omitted); *see also Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003) (noting that the Second Circuit understands the term "exceptional case" in the Lanham Act to mean "fraud or bad faith, or willful infringement" (internal citations and quotation marks omitted)).  "In other words, [the Second Circuit has] concluded that the key is willfulness on the part of the defendants:  The finding of willfulness determines the right to attorney's fees."  *Louis Vuitton*, 676 F.3d at 111 (internal citations and quotation marks omitted); *see also Mister Softee of Brooklyn, Inc. v. Boula Vending, Inc.*, 484 F. App'x 623, 624 (2d Cir. 2012) ("[W]e have said that a finding of willfulness, fraud, or bad faith is a prerequisite to finding a case sufficiently exceptional to warrant an award of fees under section 1117(a)." (internal citations, quotation marks, and emphasis omitted)).

Plaintiff urges this Court to reject the Second Circuit's current interpretation of the attorney's fees provision in the Lanham Act and instead apply the more flexible standard set forth by the Supreme Court in *Octane Fitness*.  In support of this argument, Plaintiff notes that the fee provisions in the Lanham Act and the Patent Act are nearly identical, and that the *Octane Fitness* Court cited a decision interpreting the term "exceptional" in the Lanham Act in support of its general definition of that term with respect to the Patent Act.  However, as Defendants correctly note, the Supreme Court was interpreting only the Patent Act and not the Lanham Act in *Octane Fitness*.  As such, the Second Circuit cases interpreting the fee provision of the Lanham Act remain good law and represent binding precedent on this Court.

Here the jury found that Fossil's infringement was not willful, which finding the Court upheld in its ruling on the parties' post-trial motions.  Thus, Plaintiff may not rely on Defendants' willful conduct to justify an award of fees in this case.  Plaintiff's main

argument in support of finding that this is an "exceptional" case under the Lanham Act is that Defendants' claim with respect to "back door" sales of genuine snaps was groundless. However, as discussed above, the Court has rejected this argument in light of its ruling on Plaintiff's Rule 50(a) motion. Although the Court concludes that the case is "exceptional" under the more lenient Patent Act standard announced in *Octane Fitness*, it does not find that Defendants acted fraudulently or in bad in faith by taking the position they did with respect to trademark infringement. Therefore, the Court concludes that, in the absence of bad faith, fraud, or willfulness on the part of Defendants, this case is not "exceptional" within the meaning of the Lanham Act and Plaintiff is not entitled to recover its reasonable attorney's fees under that statute.

### C.   The Connecticut Unfair Trade Practices Act

CUTPA provides that "[i]n any action brought by a person under this section, the court may award, to the plaintiff, in addition, to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." Conn. Gen. Stat. § 42-110g(d). Connecticut courts have recognized that "[t]he language of the statute is clear and unambiguous; the awarding of attorney's fees is within the discretion of the trial court." *Staehle v. Michael's Garage, Inc.*, 35 Conn. App. 455 (1994); *see also Gargano v. Heyman*, 203 Conn. 616, 622 (1987) ("Awarding . . . attorney's fees under CUTPA is discretionary . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done." (internal citations omitted)). Thus, although Defendants are correct in their argument that the Court is not required to award fees in this case, as Plaintiff's comprehensive case law review suggests (*see* Pl.'s Reply [Doc. # 369] at 3–5), a survey of the precedent in this state indicates that unlike the Patent

Act and the Lanham Act, fee awards under CUTPA are the rule, rather than the exception.

Defendants argue that the Court should exercise its discretion not to award fees and costs in this case because CUTPA was only "minimally implicated" in these proceedings. "The public policy underlying CUTPA is to encourage litigants to act as private attorneys general and to engage in bringing actions that have as their basis unfair or deceptive trade practices. In order to encourage attorneys to accept and litigate CUTPA cases, the legislature has provided for the award of attorney's fees and costs." *Jacques All Trades Corp. v. Brown*, 42 Conn. App. 124, 131 (1996) (internal citations omitted). Defendants argue that because Plaintiff is a "well-heeled" litigant that has been more than able to finance this litigation, the public policy behind the CUTPA attorney's fees provision is not implicated by this case. Defendants cite the following passage from this Court's decision in *General Clutch Corp. v. Lowry*, 93cv1983 (JBA), Slip. Op. (D. Conn. July 11, 1997), in support of their argument:

> The Court is not persuaded otherwise by plaintiff's argument that it is entitled to attorney's fees because it acted as a private attorney general by prosecuting its CUTPA claim. While there is no dispute that CUTPA provides for attorney's fees in order to encourage private CUTPA litigation, there is little basis for this Court to conclude that plaintiff would have been unable or unwilling to initiate the present suit without the incentive of CUTPA attorney's fees. Plaintiff is a large corporation that has already "paid in full" more than a quarter of a million dollars in attorney's fees and costs in connection with this litigation. Plaintiff requested more than $20,000,000 in damages, and was actually awarded nearly $400,000. As defendants observe, the present action is not a case of David versus Goliath. Although CUTPA attorney's fees are clearly not limited to "Davids," the public policy behind the fee-shifting provision seems only minimally implicated when the Court requires a corporate "Goliath," which has brought a CUTPA claim as only one count of an expensive, high-stakes commercial litigation action, to comply fully with

ADD-10

the requirement that it demonstrate the reasonableness of any fee award it seeks.

*Id.* at 15–16 (internal citations and quotation marks omitted).

Although there are some similarities between the circumstances in *General Clutch* and those present here, *General Clutch* is readily distinguishable.  In that case, the Court first found that the majority of the plaintiff's fees likely were likely statutorily barred by the Connecticut Uniform Trade Secrets Act and that the plaintiff had provided little guidance to the Court for separating those fees that were related to its trade secrets claims from those that were related to independent CUTPA claims.  *Id.* at 12–13.  The Court further held that the plaintiff had failed to meet its burden to show that its requested fees were reasonable because the plaintiff's fee position was supported only by billing records.  *Id.* at 13–15.  It was in the context of these findings that the Court determined that the public policy behind CUTPA would be "minimally implicated" by requiring a large corporate plaintiff to properly support its fee petition.  By contrast, in the present case, Romag has carefully supported its fee petition with detailed billing records and affidavits.  Furthermore, there is no statutory bar to an award of fees in this case.  Although the Court has concluded that an award of fees is not justified under the Lanham Act, several circuits have determined that the Act does not preempt more favorable state law attorney's fees provisions.  *See Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 41–42 (1st Cir. 2006); *Tonka Corp. v. Tonk-A-Phone, Inc.*, 805 F.2d 793, 794–95 (8th Cir. 1986).

Defendants also argue that Plaintiff's CUTPA claim was insignificant compared to its federal claims, as the issue of trademark infringement clearly dominated the trial in this case.  Defendants surmise, in light of Plaintiff's decision to forgo any damages claim under CUTPA aside from its punitive damages and attorney's fees claims, that Plaintiff

11

ADD-11

likely brought its CUTPA claim solely to recover attorney's fees that Romag would have been otherwise unable to recover. In *Manufacturers Technologies, Inc. v. Cams, Inc.*, 728 F. Supp. 75, 86 (D. Conn. 1989), a court in this district determined that where a plaintiff sought "to use the CUTPA violation as a vehicle to recover attorneys' fees," it would exercise its discretion not to grant such an award "[g]iven the relative lack of significance of the CUTPA claims vis-à-vis the other claims asserted." *Id.* Defendants further argue that Plaintiff's CUTPA claim is insignificant compared to its trademark and patent infringement claims because the majority of the accused snaps were not sold in Connecticut. This Court has previously recognized that Connecticut has a limited public interest under CUTPA in conduct occurring outside the state. *See Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005), *aff'd in pertinent part on reconsideration*, 409 F. Supp. 2d 112 (D. Conn. 2006).

However, Defendants' arguments notwithstanding, the Court does not believe that Plaintiff's CUTPA claim was so insignificant as to merit the denial of Plaintiff's attorney's fees and costs. Because Plaintiff itself is a Connecticut business and because the unfair practice at issue in this case—i.e. the sale of counterfeit snaps—undisputedly occurred at least in part in Connecticut, the state does have an important interest in deterring the conduct that gave rise to Fossil's liability under CUTPA. Additionally, although Romag may have used its CUTPA claim as a "vehicle" to recover attorney's fees, as discussed above, this case raises unique deterrence concerns that are properly vindicated by the public policy behind the CUTPA attorney's fee provision. Furthermore, although an award of attorney's fees is not warranted under the Lanham Act, the Lanham Act does not preempt the more liberal attorney's fees provision in CUTPA, and, in light of Connecticut's defined interest in this case, it would offend

12

ADD-12

principles of comity to declare that a fee award was unwarranted simply because the federal causes of action predominated at trial.  Finally, as discussed above, the Court is not persuaded by Defendants' argument that Plaintiff's laches and its conduct with respect to the TRO in this case was so inequitable as to justify the denial of any fee award.  Such conduct did not permeate the trial and has already been addressed by a sanctions award and a reduction of damages.  Therefore, the Court will exercise its discretion under CUTPA to award Plaintiff its attorney's fees and costs in this case.

Defendants argue that if the Court awards Romag its fees and costs under CUTPA, the Court should apportion the award so that Romag may not recover fees connected to its patent and trademark claims.  Because the Court has found that Plaintiff is entitled to recover its attorney's fees under the Patent Act, the apportionment of fees related solely to Plaintiff's patent claims is not necessary.  Plaintiff argues that because the factual predicate for its CUTPA claim was identical to the factual predicate for its trademark infringement and unfair competition claims, no apportionment is necessary with respect to those claims.  The Connecticut Supreme Court has recognized that "when certain claims provide for a party's recovery of contractual attorney's fees, but others do not, a party is nevertheless entitled to a full recovery of reasonable attorney's fees if an apportionment is impracticable because the claims arise from a common factual nucleus and are intertwined."  *Total Recycling Servs. of Connecticut, Inc. v. Connecticut Oil Recycling Servs., LLC*, 308 Conn. 312, 333 (2013).  The Court agrees with Plaintiff that its CUTPA claim was so intertwined with its other causes of action that the vast majority of its costs and fees cannot be apportioned between the claims at issue in this case.  However, the Court can identify one category of costs and fees that are associated solely with Plaintiff's trademark infringement fees and thus should be apportioned—those costs

and fees that were incurred solely in relation to Plaintiff's claim for an award of Defendant's profits under the Lanham Act.  Thus, Plaintiff is not entitled to recover any costs and fees that were incurred solely in pursuit of an accounting of Defendants' profits.

Finally, Defendants argue that Plaintiff is not entitled to recover its non-taxable costs under CUTPA.   The Connecticut Supreme Court has not yet addressed the issue of whether non-taxable costs may be awarded pursuant to § 42-110g(d).  *See Ubrich v. Groth*, 310 Conn. 375, 461 (2013) (declining to address the issue).  Thus, this Court must predict how the Connecticut Supreme Court would rule if squarely confronted with this issue.  *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005).  The Second Circuit has noted that courts should principally consider "the language of the state intermediate appellate courts to be helpful indicators of how the state's highest court would rule." *Id.*  "Rulings from such courts are a basis for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (internal citations and quotation marks omitted). Although at least one court in this district has concluded that § 42-110g(d) permits an award of costs beyond those identified as taxable costs in state statutes, that case was decided before the Appellate Court of Connecticut addressed the issue.  *See Bristol Tech., Inc. v. Microsoft Corp.*, 127 F. Supp. 34, 82–83 (D. Conn. 2000).  The Appellate Court of Connecticut has repeatedly recognized that a plaintiff may not recover costs under CUTPA beyond those costs recognized by statute as taxed costs.  *See Taylor v. King*, 121 Conn. App. 105, 133–35 (2010); *Centimark Corp. v. Village Manor Assocs. Ltd. P'ship*, 113 Conn. App. 509, 540–41 (2009), *cert. denied*, 292 Conn. 907 (2009); *Miller v. Guimaraes*, 78 Conn. App. 760, 782–83 (2003).   Although the reasoning of these cases has been criticized by several trial courts, the Connecticut Supreme Court has declined the

14

ADD-14

opportunity to overturn them, and thus the Court believes that the Connecticut Supreme Court would find that non-taxable costs are not recoverable under CUTPA. Therefore, Plaintiff is not entitled to recover its non-taxable costs in this case.

### D.    Motion for Supplemental Relief

Shortly before trial began, Plaintiff moved [Doc. # 378] for an award of sanctions, pursuant to 28 U.S.C. § 1927 and this Court's inherent authority, in the form of a Court order awarding Plaintiff its fees and costs associated with the trial deposition of Doug Dyment and the deposition of Gail Stoke and barring Defendants from calling Ms. Stoke as a witness at trial. Plaintiff argues that counsel for Defendants misrepresented Mr. Dyment's availability as a witness to the Court, thereby necessitating a costly, last-minute trial deposition of a key witness on the eve of trial. The Court denied Plaintiff's request for an order excluding Ms. Stoke as a witness (*see* Pre-Trial Conf. Tr. Vol. II [Doc. # 432] at 208), and reserved judgment on the issue of attorney's fees and costs. Defendants oppose this motion, arguing that they did not intentionally conceal information regarding Mr. Dyment's retirement and possible availability at trial from the Court.

"In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment and delay." *Enmon v. Prospect Capital Corp.,* 675 F.3d 128, 143 (2d Cir. 2012) (internal citations and quotation marks omitted). "Although both findings must be supported by a high degree of specificity in the factual findings, bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id.* (internal citations and quotation marks omitted). "The showing of bad faith required to support sanctions

15

ADD-15

under 28 U.S.C. § 1927 is similar to that necessary to invoke the court's inherent power. In practice, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Id.* at 143–44 (internal citations and quotation marks omitted).

Prior to trial, Mr. Dyment, a Fossil employee, had been identified by both parties as a key fact witness and had been selected to serve as Fossil's corporate representative at trial. However, in late January 2014, Defendants indicated that they would not be calling Mr. Dyment as a witness or producing him at trial because he had unexpectedly retired. (*See* Pl.'s Mot. to Take Deposition [Doc. # 280] at 6.) In response to this information, Plaintiff sought leave from the Court to take Mr. Dyment's trial deposition. (*Id.*) Defendants sought leave [Doc. # 279] to substitute Ms. Stoke as the corporate representative of Fossil and offered to make her available for a deposition in Connecticut or New York. The Court held a telephonic conference regarding these issues on February 12, 2014. During the conference, the Court had the following colloquy with defense counsel:

| | |
|---|---|
| Mr. Cass: | . . . The sole reason I'm seeking to substitute Ms. Stoke for Mr. Dyment is because we need a corporate representative to sit through a two-week trial and he's retired, and that's an awful lot to ask a retired person to— |
| The Court: | I understand if you can't get him to come under any auspices, and as we set out at the beginning, you all agree he's unavailable. Here's how— |
| Mr. Cass: | Well, he's not—I don't want to overstate that he's not available because— |
| The Court: | Well, that's what you said though. |
| Mr. Cass: | Well, but not in the—you know, in terms of getting an agreement with him to come, I think we can get that. |

ADD-16

| The Court: | Okay. |
|---|---|
| Mr. Cass: | Or that was in the works. |
| The Court: | As a matter of— |
| Mr. Cass: | The problem is, you Honor, I can't count on that.  I can't. If he decides the week before trial not to come, what do I do? |
| The Court: | All right.  He's legally unavailable because he's more than 100 miles.  He's outside your subpoena power. |
| Mr. Cass: | Exactly. |

(Conf. Tr. [Doc. # 324] at 27–28.)  Ultimately, the Court granted Plaintiff's motion to take Mr. Dyment's trial deposition and permitted Defendants to substitute Ms. Stoke as Fossil's corporate representative.  The parties made arrangements for Mr. Dyment's trial deposition to be conducted in Dallas, but the Friday before the deposition was to take place, counsel for Defendants emailed Plaintiff's counsel a copy of a January 22, 2014 contract between Mr. Dyment and Fossil in which Mr. Dyment agreed to make himself available for trial in Connecticut and Fossil agreed to compensate Mr. Dyment for his time.  (*See* Dyment Contract, Ex. C to Geiger Decl. [Doc. # 373].)

Romag argues that Defendants' failure to bring this contract to the attention of the Court during the February 12, 2014 status conference and their belated disclosure of the document to Plaintiff on the eve of Mr. Dyment's trial deposition was a deliberate attempt to mislead the Court and thus constitutes sanctionable bad faith conduct.  The Court disagrees.  Counsel for Defendants disclosed to the Court that such an agreement was "in the works," and the Court will take counsel at his word that he did not know that the contract had already been executed when he made this representation.  Counsel was careful to clarify that Mr. Dyment was "legally" unavailable, and that Defendants' request to substitute witnesses was made to protect against the chance that Mr. Dyment might refuse to appear.  The contract between Fossil and Mr. Dyment could not have been

17

ADD-17

enforced to compel Mr. Dyment's presence at trial, and as a resident of Texas, he was outside the range of this Court's subpoena power. Therefore, the contract notwithstanding, Mr. Dyment was "legally" unavailable, and thus defense counsel's representations do not appear to have been deliberately false or misleading. Furthermore, the existence of the contract was disclosed to Plaintiff prior to the deposition, albeit at the last moment. Even if Plaintiff and the Court had known of this contract at the time of the February 12, 2014 conference, it is likely that Mr. Dyment's trial deposition still would have been necessary, because in light of his retirement,[2] Defendants could not guarantee his presence at trial. Based on a review of the record, the Court concludes that Defendants' conduct with respect to the substitution of Ms. Stoke and Mr. Dyment's trial deposition did not constitute bad faith warranting sanctions. Therefore, Plaintiff's motion for supplemental relief in the form of attorney's fees and costs is denied.[3]

## II.    Conclusion

For the foregoing reasons, Plaintiff's Application [Doc. # 450] for Attorney's Fees and Costs is GRANTED in part, and Plaintiff's Motion [Doc. # 378] for Supplemental Relief is DENIED. Plaintiff is entitled to recover its reasonable fees and cost under CUTPA and the Patent Act. However, Plaintiff is not entitled to recover its fees under the Lanham Act, and thus may not recover any fees incurred exclusively in pursuit of Romag's claim for an award of Defendants' profits in connection with its trademark infringement claims. Plaintiff also may not recover its non-taxable costs under CUTPA.

---

[2] There is no evidence in the record to suggest that Mr. Dyment's decision to retire in January 2014 was anything other than a long-planned-for personal choice to stop working at a certain age.

[3] The Court notes that in light of its finding that Plaintiff is entitled to recover attorney's fees and costs under the Patent Act and CUTPA, most of Plaintiff's expenses with respect to the Dyment and Stoke depositions are likely recoverable.

Finally, as this Court ruled in its memorandum of decision after the bench trial, Plaintiff may not recover its costs and fees related to its pursuit of a TRO in this case.

In light of the existing scheduling order with respect to the fee petition, Defendants' opposition to Plaintiffs Motion [Doc. # 466] to Compel shall be filed no later than seven days after the issuance of this opinion. Any reply shall be filed within seven days of the filing of the opposition. In light of the Court's rulings excluding certain categories of fees—i.e., (1) fees incurred in pursuing the TRO, (2) fees incurred solely in pursuit of Plaintiff's Lanham Act claim for an award of Defendants' profits, and (3) non-taxable costs under CUTPA—Defendants are directed to submit a supplemental opposition limited to identifying objections to specific fees falling within those categories within seven days of the Court's ruling on the Motion to Compel. Plaintiff shall file its substantive reply within fourteen days of Defendants' supplemental opposition, or within fourteen days of Defendants' compliance with the Motion to Compel, if granted, whichever date is later.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of August, 2014.

19

ADD-19

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC.,<br>  *Plaintiff,*<br>  *v.*<br>FOSSIL, INC., FOSSIL STORES I, INC., MACY'S,<br>INC., and MACY'S RETAIL HOLDINGS, INC.,<br>  *Defendants.* | Civil No. 3:10cv1827 (JBA)<br><br>September 30, 2015 |

**RULING ON PLAINTIFF'S MOTIONS FOR ATTORNEYS' FEES**

The Court has previously granted Plaintiff's Application for Attorneys' Fees in part, permitting Plaintiff to recover its reasonable fees and taxable costs under CUTPA[1] and the Patent Act[2] but not under the Lanham Act. (First Ruling on Mot. Att'ys' Fees [Doc. # 481] at 18.) The Court did not, at that time, determine the amount of fees and costs due to Plaintiff. It does so now. For the reasons that follow, Plaintiff's Motion [Doc. # 450] for Attorneys' Fees is granted with modification.

**I.  Legal Standard**

In determining a reasonable attorney's fee under CUTPA or the Patent Act, courts begin by assessing what hourly rate a reasonable client would be willing to pay, keeping in mind the factors enumerated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).[3] *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 493 F.3d

---

[1] CUTPA permits a court to award a plaintiff "costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." Conn. Gen. Stat. § 42-110g(d).

[2] The Patent Act provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

[3] The *Johnson* factors include (1) the time and labor required by an attorney; (2) the novelty and difficulty of the questions presented by the litigation; (3) the level of skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney

110, 118 (2d Cir. 2007) ("*Arbor Hill I*"), *amended on other grounds by* 522 F.3d 182, 184 (2d Cir. 2008) ("*Arbor Hill II*") (determining reasonable fees in the context of 42 U.S.C. § 1988); *see Emerald Investments, LLC v. Porter Bridge Loan Co.*, No. CIV.A. 3:05-CV-1598J, 2007 WL 1834507, at *5 (D. Conn. June 25, 2007) (applying the *Arbor Hill* approach in a CUTPA case to calculate the presumptively reasonable fee); *City of Burlington v. Dague*, 505 U.S. 557, 561–62 (1992) (holding that because many federal fee-shifting statutes use the language "reasonable attorney fees," "case law construing what is 'reasonable' applies uniformly to all of them"). Courts "then use that reasonable hourly rate to calculate . . . the 'presumptively reasonable fee.'" *Arbor Hill I*, 493 F.3d at 118. Once the court has determined the "presumptively reasonable fee," it "may still adjust that amount" upward or downward "based on relevant factors specific to the instant case," such as the level of success the plaintiff attained.[4] *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, No. 3:03-CV-599 (CFD), 2011 WL 721582, at *3 (D. Conn. Feb. 22, 2011).

**II. Discussion**

Plaintiff, who was represented by three law firms in this case, seeks fees totaling $2,983,838 ($1,076,967.50 for Brenner, Saltzman & Wallman LLP ("BSW"), $1,811,789.50 for Cooper & Dunham LLP ("CD"), and $95,081.00 for Wiggin and Dana LLP ("WD")), expert fees

---

because of acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

[4] However, in accord with the specific statutory language in CUTPA, for purposes of determining fees under CUTPA, "the question whether plaintiff achieved a 'level of success' . . . cannot be answered . . . with reference to the dollar recovery as it is in other contexts." *Bristol Tech., Inc. v. Microsoft Corp.*, 127 F. Supp. 2d 64, 68 (D. Conn. 2000).

ADD-21

totaling $542,290.58, and costs totaling $245,083.25. (Mot. for Fees at 1–2.)  Defendants raise a number of objections which are detailed below.

### A.  Reasonableness of Hourly Rates

#### 1.  Attorney Zivin

Defendants do not contest the reasonableness of the hourly rates charged by BSW's attorneys or WD's attorneys. They do, however, object to the hourly rates charged by Attorney Norman H. Zivin of CD (*see* Opp'n Mot. for Att'ys' Fees [Doc. # 463] at 32–33), which ranged from $595 at the start of the trial to $625 at the time of trial, and averaged $610.60 (CD Summary Chart, Ex. B to Zivin Decl. [Doc. # 453]).

In determining a reasonable hourly rate in connection with an application for attorneys' fees, district courts attempt to "step[] into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively." *Arbor Hill I*, 493 F.3d at 112. Thus, courts attempt to "ascertain whether 'the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058–59 (2d Cir. 1989) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).

Where, as here, the prevailing party hires out-of-district counsel, courts generally assess the reasonableness of that counsel's hourly rate by reference to "the hourly rates employed in the district in which the reviewing court sits." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted). "[I]n order to receive an attorney's fee award based on higher out-of-district rates, a litigant must . . . persuasively establish[] that a

ADD-22

reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id.* at 172.

Defendants argue that Romag has neither established that Attorney Zivins's rate is reasonable in Connecticut nor "made a particularized showing that the participation of out-of-state counsel was likely necessary in order achieve a better result." (Opp'n at 33.) The Court disagrees.

Attorney Zivin graduated *cum laude* from Columbia University School of Law in 1968 and has practiced law with CD for 45 years. (Mem. Supp. Mot. for Att'ys' Fees [Doc. # 451] at 33; Mellitz Decl., Ex. 2 to Mem. Supp. ¶ 28.) In that time, he has worked on more than 100 intellectual property lawsuits, tried more than 30 such cases, and argued more than 20 appeals in intellectual property cases, including before the United States Supreme Court. (Mem. Supp. at 33; Mellitz Decl ¶ 28.) In addition, he possesses a degree in mining and metallurgical engineering and is a registered patent attorney. (Mem. Supp. at 33.)

Two well-regarded members of the Connecticut bar, Attorneys Jeremy A. Mellitz and Jonathan B. Tropp, testified that an hourly rate of $625 is consistent with the billing rates of Connecticut attorneys specializing in patent litigation with comparable training, skill and experience to Mr. Zivin. (*See* Mellitz Decl. ¶ 29; Tropp Decl., Ex. 3 to Mem. Supp. ¶ 5.) Attorney Tropp added, by way of example, that "an intellectual property litigation partner in [his] firm's Stamford[, Connecticut] office with training and experience comparable to Attorney Zivin's has a billing rate of $665 per hour." (*Id.*)

Plaintiff additionally notes that "[t]his is not a case where attorneys' fees are being requested in a contingent fee case. [Rather,] [t]his is a case in which the client has had the motivation to review the hourly rates and charges of counsel as the litigation proceeded" because it paid counsel's bills throughout the litigation. (Mem. Supp. at 32.) Plaintiff contends that "[t]his

4

ADD-23

is a strong indication that such charges for legal services were charges at market rates for those services, and are reasonable." (*Id.*; *see* Reply [Doc. # 501] at 11.)

Plaintiff's position finds support in the decisions of several district courts in this Circuit which have held that "when a sophisticated client pays attorneys' fees that it does not know it will necessarily recover, the rate paid is presumptively reasonable." *Wells Fargo Bank, NA v. Konover*, 2014 WL 3908596, at *5 (D. Conn. Aug. 8, 2014); *see Diplomatic Man, Inc. v. Nike, Inc.*, No. 08 CIV. 139 (GEL), 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009) ("[T]he fact that Nike, a highly sophisticated business client, has paid these bills, presumably after careful review by its general counsel or other senior business executives, is prima facie evidence of the reasonableness of the amount as a whole (beyond just the reasonableness of the hourly rates charged), since Nike could not have assumed that it would be reimbursed in full, or even in part."). The Second Circuit has been less clear about the legal effect of actual payment on the reasonableness inquiry. *See Arbor Hill II*, 522 F.3d at 190 ("The reasonable hourly rate is the rate a paying client would be willing to pay."); *Crescent Publ'g Grp., Inc. v. Playboy Enterprises, Inc.*, 246 F.3d 142, 144 (2d Cir. 2001) ("[I]f the District Court again chooses to award fees, any evidence of the actual billing arrangement between [the litigant] and its counsel should be considered a significant, though not necessarily controlling, factor in the determination of what fee is 'reasonable'. . . ."). "But regardless of the precise legal effect of this factor, it is surely of some significance that [Romag] has been willing to incur these fees. This is not a case in which [Romag] can have assumed that it was litigating on [Defendants'] ticket." *Telenor Mobile Commc'ns AS v. Storm LLC*, No. 07 CIV. 6929 (GEL), 2009 WL 585968, at *2 (S.D.N.Y. Mar. 9, 2009).

Together, the evidence Plaintiff has presented in the form of sworn statements by members of the Connecticut bar about Mr. Zivin's skills and experience and the Connecticut legal market for attorneys specializing in intellectual property litigation, as well as the fact that

ADD-24

Romag, a sophisticated client, has actually paid Mr. Zivin the fees he seeks here, persuade the Court that Mr. Zivin's hourly rate is reasonable.

### 2. Division of Labor

Defendants additionally object to Plaintiff's practice of assigning "the vast majority" of its "legal work" to "partners/principals" "rather than junior attorneys." (Opp'n Att'y Fees [Doc. # 465] at 32–34.) According to Defendants, BSW "principals" Attorneys Schaefer, Fisher, and Daniels billed 91% of the hours billed by BSW, and CD partners Attorneys Zivin, Miller, and Sayour billed 76% of the hours billed by CD. (*Id.* at 34.) Because "partners/principals billed for work that should have been done by associates or even clerical staff," Defendants claim, Plaintiff's counsels' fees are excessive and should be reduced. (*Id.*)

The Court is unpersuaded. As an initial matter, the Court finds it probative, as discussed above, that Romag did in fact pay the fees counsel seeks here.  In addition, the Court notes that although he was a partner at BSW, Attorney Fisher (who billed about 24% of the total hours billed to Romag) billed at an average rate of $232.43 per hour, a rate comparable to associate rates.  (*See* Reply at 16; BSW Summary Bill, Ex. A to Schaefer Decl.) Further, by Defendants' own admission, 24% of CD's hours were billed by associates. (*See* Opp'n at 34.) Finally, the Court is not convinced that it is necessarily less efficient to assign relatively more work to more experienced attorneys. As Judge Lynch noted in *Hnot v. Willis Grp. Holdings Ltd.*, No. 01 CIV. 6558 (GEL), 2008 WL 1166309, at *8 (S.D.N.Y. Apr. 7, 2008), it is "equally plausible . . . that plaintiffs' relative reliance on more experienced partners allowed them to devote fewer hours to any given task." *See Skold v. Am. Int'l Grp., Inc.*, No. 96 CIV. 7137 (HB), 1999 WL 672546, at *1 (S.D.N.Y. Aug. 25, 1999) ("[A]n hour spent by experienced counsel may be more efficient and in the end save more time than when that hour is expended by less experienced staff with less

ADD-25

supervision and guidance."). The Court will not therefore reduce Plaintiff's counsel's billing rate on the basis of inefficient staffing.

### B. Reasonableness of Hours Requested

The Court now turns to Defendants' objections to the number of hours requested by Plaintiff. Defendants contest four categories of claimed fees: (1) for various unsuccessful claims and motions (Opp'n at 35); (2) for "an e-discovery frolic and detour relating to Romag's demand that Fossil search its email back-up tapes" (*id*.); (3) for work performed by partners that should have been performed by associates (Albert Decl. [Doc. # 464] ¶ 22); and (4) for activities unrelated to this matter or for frivolous tasks (*id*.). Each objection is addressed below.

#### 1.  Unsuccessful Claims/Motions

Defendants contend that Plaintiff should not receive fees for several unsuccessful claims. The Supreme Court has explained that:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, . . . counsel's work on one claim will be unrelated to his work on another claim. . . . The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley v. Eckerhart*, 461 U.S. 424, at 434–35 (1983). Nonetheless, "[w]here the district court determines that the successful and unsuccessful claims are inextricably intertwined and involve a common core of facts or are based on related legal theories, it is not an abuse of discretion for the court to award the entire fee." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) (internal quotation marks and brackets omitted). Thus, in assessing Defendants' objections, the Court must assess whether or not the successful and unsuccessful claims are inextricably intertwined.

#### a.  Claims against Retailer Defendants

Defendants assert that "Romag should . . . be denied recovery of time spent on the unsuccessful Retailer Defendants claims." (Opp'n at 35.) According to Defendants, Romag's bills for that time total $98,633, including $13,515.00 billed by BSW and $85,118.00 billed by CD. (Albert Decl. ¶ 12; Ex. A to Albert Decl.) Plaintiff responds that "[d]iscovery of the underlying facts of all claims against all Defendants was consolidated and interrelated," and in any event, "[t]his Court has already effectively rejected Defendants' rationale for excluding such time when, following *Total Recycling Services*, it decided to exclude only time spent solely on Romag's claim for Defendants' profits." (Reply at 9, *id.* n.4.) This argument, however, misconstrues the Court's previous Ruling.  There, the Court held that it was impracticable to apportion "the vast majority of . . . costs and fees" between Plaintiff's CUTPA claim and its trademark claim. (First Ruling on Mot. Att'ys' Fees at 13.) The Court *did not* hold that it was impracticable to apportion costs and fees between Plaintiff's successful claims against Macy's and its unsuccessful claims against the Retailer Defendants. (*See id.*)

Quite the contrary, as evidenced by the chart compiled by Defendants in Exhibit A to the Albert Declaration, many of Plaintiff's counsel's entries relate exclusively to the Retailer Defendants and thus can easily be separated from work on successful claims. For example, time spent drafting the complaint against the Retailer Defendants (initially filed in a separate suit), serving them, preparing the 26f report with respect to the Retailer Defendants, preparing the motion to consolidate, and requesting and reviewing documents related specifically to the Retailer Defendants is unrelated to the claims on which Plaintiff succeeded. Exhibit A is, however, not limited to these clearly severable entries. Rather, the portion Defendants pulled from CD's invoices additionally includes numerous entries regarding Macy's, against whom Plaintiff succeeded on some claims and failed on others. It is not possible to distinguish work on the successful claims from work on the unsuccessful claims based solely on the entries listed in

8

Exhibit A. In addition, many of the entries in Exhibit A, with respect to both BSW and CD, are excerpts of entries that included work on several items, some of which were unrelated to the Retailer Defendants.

Recognizing these limitations, the Court will reduce BSW's fee by $6,757.50 (half of the amount requested by Defendants) and CD's fee by $21,279.50 (twenty-five percent of the amount requested by Defendants)[5], for a total reduction of **$28,037**.

### b.  Motions to Amend

Next, Defendants argue that Plaintiff's fees should be reduced by $159,726.25 for work related to Plaintiff's "four attempts to add a claim under the False Marketing Statute, 35 U.S.C. Section 292." (Suppl. Albert Decl. [Doc. # 498] ¶ 6; *see* Suppl. Opp'n [Doc. # 497] at 14.) Plaintiff maintains that there should be no reduction made with respect to its false marketing claim, on the grounds that "the issues related to § 292 of the Patent Act were factually intertwined with all of the other claims throughout the litigation."  (Reply at 21.) Indeed, Plaintiff notes, "Defendants first introduced § 292 of the Patent Act as a counterclaim in their answer to Romag's complaint" and "Romag then raised § 292 of the Patent Act." (*Id.* at 20–21.) Should the Court find that Plaintiff's work relating to § 292 is separable however, Plaintiff argues that the total amount that should be deducted from Plaintiff's fee is $72,599.00, not $159,726.25 as Defendants claim. (*Id.* at 22 n.9; *see* Ex. 2 to Schaefer Suppl. Decl. [Doc. # 502], Ex. B to Zivin Suppl. Decl. [Doc. # 503], Ex. 2 to Freiman Suppl. Decl. [Doc. # 504].)

While Plaintiff is certainly correct that some of the factual issues related to its counterfeit marking claim were intertwined with other claims, it does not follow from this that Plaintiff's work on its various attempts to add the counterfeit marking claim are inseparable from its work

---

[5] Fewer of the entries highlighted by Defendants with respect to CD appear to be specific to the claims against the Retailer Defendants than with respect to BSW.

on other claims. The majority of entries to which Defendants object are for work specifically on the motions to amend or for jury instructions on false marking. Because Plaintiff's repeated attempts to add a false marking claim were unsuccessful and much of the work related to that work is separable from other work, the Court finds that a reduction is appropriate.

Based on the Court's review of Defendants' and Plaintiff's marked-up versions of Plaintiff's billing records, it appears that the parties largely agree about which entries relate to the § 292 claim. Where the parties diverge is primarily on the question of how to handle block-billing. Plaintiff arrived at its figure of $72,599 by estimating the portion of block-billed entries that relate to § 292 work. Defendants appear to have included the entire amount of time for all work listed in one entry where only some of that work related to § 292. Defendants' method clearly overstates the amount of time Plaintiff spent on § 292 work, but having reviewed Plaintiff's estimates, the Court believes they slightly understate the amount of time spent on § 292 work.

The Court thus concludes it would be appropriate to deduct **$79,858.90** (comprising Plaintiff's estimated § 292 fees plus 10%) from Plaintiff's claimed fees ($19,111.40 from BSW, $48,194.30 from CD, and $12,553.20 from WD) to account for work related to Plaintiff's failed efforts to add a false marking claim.

### c.  TRO

In its previous Ruling on Plaintiff's motion for attorneys' fees, the Court held that "Plaintiff may not recover its costs and fees related to its pursuit of a TRO in this case." (First Ruling on Mot. Att'ys' Fees at 19.)  The Court then directed the parties to identify which fees were "incurred in pursuing the TRO." (*Id.*)  Defendants identified $176,032.50 of fees, covering "[v]irtually all of Romag's counsel's fees incurred in the time leading up to and through December 22, 2010" and Romag's defense of six witnesses deposed by Defendants "in an effort to

10

figure out the facts relating to what Romag knew and when it knew it regarding the counterfeit snaps." (Suppl. Opp'n at 5.) Plaintiff argues forcefully against this approach, asserting that "[t]here is no way this Court's order could possibly be construed to exclude any time other than that preparing the TRO papers, participating in court proceedings related thereto, and preparing the contempt papers," which "ended on the date Defendants agreed to a preliminary injunction." (Reply at 10–11.) Including only these activities, Plaintiff concludes that it incurred $28,751.25 of fees in pursuit of the TRO. (*Id.* at 11.)

The Court is not persuaded by Defendants' arguments. With respect to the period between November and December 22, 2010, Plaintiff admits that some of the billing entries related to the TRO, but clearly not all of them did. (*See* Ex. 1 to to Schaefer Suppl. Decl. at 3–8; Ex. A, Pt. 1 to Zivin Suppl. Decl. at 3–9.) Plaintiff filed the lawsuit on November 22, 2010, the day before it moved for a TRO. Much of the work in the lead-up to November 22 appears related to preparing the complaint and preparing for litigation generally. (*See* Ex. 1 to to Schaefer Suppl. Decl. at 3–4; Ex. A, Pt. 1 to Zivin Suppl. Decl. at 3–4.) From November 22 to December 22, 2010, in addition to working on the TRO, the billing records reveal that Plaintiff's counsel was engaged in arranging service of process on Defendants, drafting the Rule 26(f) report, and reviewing Defendants' answer and counterclaim. (*See* Ex. 1 to to Schaefer Suppl. Decl. at 4–8; Ex. A, Pt. 1 to Zivin Suppl. Decl. at 4–9.) Nonetheless, a significant portion of the period from November to December 22, 2010 was dedicated to work on the TRO—more than Plaintiff admits. The vagueness of the some of the billing entries, particularly those of CD, however, makes the Court's task in parsing out relevant activities and irrelevant activities, difficult. For this reason, and because the Court believes Plaintiff has failed to account for all billing entries related to the TRO, the Court will increase Plaintiff's figure by 25%, for a total reduction of Plaintiff's fees by **$35,939.06** ($22,105.31 from BSW and $13,833.75 from CD).

11

ADD-30

The Court will not, however, include in this sum discovery-related costs, as Defendants urge. The six depositions to which Defendants point include that of Howard Reiter, whose deposition, by Defendants' own accounting, "encompassed numerous issues, including patent issues" (Albert Suppl. Decl. at 9), and was therefore not limited to issues relating to Defendants' efforts to expose Plaintiff's delay in seeking a TRO.  Furthermore, the Court is not persuaded that the other five witnesses identified by Defendants would not have been deposed even if Plaintiff had not sought a TRO because when and how the counterfeiting was discovered was relevant background to the suit regardless of the TRO.

### d.  Lanham Act Profits

Because the Court previously ruled that "Plaintiff is not entitled to recover any costs and fees that were incurred solely in pursuit of an accounting of Defendants' profits" (First Ruling on Mot. Att'ys' Fees at 14), both parties have highlighted billing entries which they argue should be excluded because they pertain to Romag's counsel's work on the issue of profits.

Defendants contend that Romag's counsel's fees should be reduced by $1,770,699.50, which comprises $728,045.50 in fees Defendants claim were for work pursuing Defendants' profits; two-thirds of the $760,259.75 billed by Romag's attorneys for trial preparation; two-thirds of the $230,489.50 billed by Romag's attorneys for trial; and two-thirds of the $573,154.50 billed for activities ambiguously described in the billing records. (Suppl. Opp'n at 9–11.) The $728,045.50 in fees for work Defendants coded as relating to profits includes work on the depositions of eleven witnesses and four experts, requests for production and interrogatories, and summary judgment. (*Id.* at 6–9.) With regard to the billing entries Defendants have coded "trial preparation," "trial," and "vague," Defendants explain that "[g]iven that the driver in this case was Romag's single-minded pursuit of Defendants' profits, and . . . that the patent damages Romag sought were only 1.5% of the total amount of profits award Romag sought, Romag should

be allocated a percentage of at most 33.33% of the non-specific fees" Defendants identified.  (*Id.* at 10.)

In so arguing, however, Defendants ignore the Court's prior holding that Plaintiff's "CUTPA claim was so intertwined with its other causes of action that the vast majority of its costs and fees cannot be apportioned between the claims at issue in this case." (First Ruling on Mot. Att'ys' Fees at 14.) As Plaintiff notes, its CUTPA claim relied on a showing of willfulness, and therefore a blanket exclusion of all fees associated with proving willfulness is not appropriate, notwithstanding Defendants' arguments to the contrary. Further, in light of the Court's instruction to the parties to highlight only fees incurred "*solely in relation to*" Romag's claim for profits (*id.* at 14 (emphasis added)), Defendants' acknowledgement that not all of the work it identified relating to discovery pertained *exclusively* to profits (*see* Suppl. Opp'n at 7) is dispositive.

Additionally, Defendants curiously contend that Plaintiff should be precluded from recovering fees for its counsel's work successfully defending against Defendants' motion for summary judgment on the issue of profits. (*Id.* at 8.) Since Plaintiff prevailed on that motion, the Court will award fees for Plaintiff's counsel's work on it.

Defendants additionally seek to exclude many of the billing entries that refer to "damages" or "sales," on the grounds that such entries relate to profits. However, the Court is persuaded that such work was necessary for Plaintiff's Patent Act claim (because damages are awarded based on the number of handbags sold) and did not therefore relate solely to profits under the Lanham Act. Next, Defendants assert that Romag should not be awarded fees for work related to demonstrating that Defendants' sales were attributable to its use of Romag's mark. However, as Plaintiff notes, such evidence was relevant to Romag's CUTPA claim and its efforts to show irreparable harm, in order to obtain a permanent injunction.

ADD-32

Finally, Defendants seek to exclude work related to the presentation of Dr. Beutel's testimony. Plaintiff opposes, arguing that not all of Dr. Beutel's testimony concerned the calculation of Defendants' profit. Plaintiff does admit, however, that some attorney time was spent working with Dr. Beutel to "wade[] through an enormous quantity of raw data from Fossil's sales system" to calculate Defendants' profits. (*Id.* at 10.) Plaintiff nonetheless contends that such time should not be excluded because the work was "necessary and appropriate in determining the number of handbags sold." (*Id.*) The Court is not persuaded that an expert was necessary to determine the number of handbags sold by Fossil. Rather, it appears that Dr. Beutel's primary contribution was in calculating Defendants' profit.

After reviewing the parties' submissions, the Court finds that Defendants have vastly overstated the amount of time spent *solely* on profit, and Plaintiff's estimate is much closer to the mark. Nonetheless, Plaintiff does omit some entries the Court finds excludable as relating solely to profit. Thus, the Court will add 10% to Plaintiff's proposed reduction, yielding a total reduction of **$75,588.43** ($31,178.13 from BSW, $27,095.20 from CD, and $17,315.10 from WD).

### 2.  Discovery of Email Backup Tapes (ESI)

In addition to seeking to exclude fees related to Plaintiff's unsuccessful claims, Defendants contend that $124,674.04 in fees should be excluded because they "relate to work involved in searching Fossil's back-up tapes," the cost of which Judges Kravitz and Young both ruled were to be borne by Romag. (Albert Decl. ¶¶ 13–15.) Plaintiff responds that "[n]either Judge Kravitz nor Judge Young in their discovery rulings decided who should ultimately bear the fees and costs associated with the discovery of emails stored on Fossil's backup tapes." (Reply at 8 n.3.) The Court agrees.

Judge Kravitz ruled [Doc. # 148] on July 17, 2012 that Romag would pay "all the costs associated" with the first phase of restoring and searching the Dallas and Hong Kong servers. On

ADD-33

April 1, 2013, Judge Young ordered [Doc. # 244] each party to pay its own costs for the second phase of restoring and searching the servers. Neither Judge, however, discussed attorneys' fees. Because Defendants' only argument that these fees should be excluded is that Judges Young and Kravitz so ordered and the Court does not interpret their orders to exclude fees, the Court declines Defendants' invitation to deduct $124,674.04 in fees associated with the production of the back-up tapes.

### 3.    Work Done by Partners that could have been done by Associates

Defendants next request that the Court deduct $100,538.50 of fees for work performed by partners that should have been done by associates, including "legal research," "booking travel," and "delivering papers to the Court." (Albert Decl. ¶ 22a.) With respect to legal research, this argument appears to simply rehash Defendants' already-rejected claim that Plaintiff's counsel's fees should be reduced because the majority of work was assigned to partners rather than associates. With respect to other categories of expenses, even if the work was not appropriate for a partner, it does not follow that the entirety of the claimed fees should be deducted, rather than merely reducing the rate at which that work is billed. Further, having reviewed the billing records, the Court has found only a few instances in which a BSW partner billed for work that should have been performed by an associate, and in each instance, the partner billed at a rate of $195 an hour, a rate comparable to a reasonable associate hourly rate. The Court does not find any billing entries in CD's invoices where associate-level work is billed at a partner rate.[6] Therefore, the Court will not deduct any fees from Plaintiff's claimed fees for work done by partners that should have been done by associates.

### 4.    Unrelated Work and Frivolous Tasks

---

[6] Defendants do not claim that WD billed for associate-level work at partner rates.

15

ADD-34

Defendants additionally seek deductions in Plaintiff's claimed fees for work unrelated to this matter and frivolous tasks such as "[s]earch[ing] for flights to Dallas, TX." (Albert Decl. ¶ 22b & c.) The Court has reviewed these records and is persuaded by most of Defendants' arguments. Therefore, $5,023.75 will be deducted from BSW's claimed fees and $4,069 will be deducted from CD's claimed fees, for a total deduction of **$9,092.75**.

### 5. Legal Research

In addition to hourly fees, Plaintiff claims $37,137 in legal research fees charged by Pacer, Westlaw, and Lexis. Because the Second Circuit has held that the "charges for . . . online research may properly be included in a fee award," *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004), the Court awards Plaintiff **$37,137** for its legal research fees ($25,418.99 to CD; $10,706.89 to BSW; and $1,011.12 to WD).[7]

### C. Adjustments

### 1. Excessive, Redundant, and Unnecessary Entries

Defendants seek a 10% across-the-board reduction "to account for inappropriate billing" (block billing, vague entries, and entries for duplicative, excessive, or unnecessary work). (Opp'n at 38–39.)

Although counsel seeking fees are "not required to record in great detail how each minute of [their] time was expended," *Hensley*, 461 U.S. at 437 n.12, they are obliged "to keep and present records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required; where adequate contemporaneous records have

---

[7] The Court is cognizant that the Local Rules of Civil Procedure proscribe the award of legal research fees as costs, D. Conn. L. Civ. R. 54(c)(7), but the fees are awarded here as part of the award of attorney's fees, not as taxable costs.

16

not been kept, the court should not award the full amount requested," *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987). "[C]ounsel should at least identify the general subject matter of his [or her] time expenditures," and in the absence of such identification, a court may refuse to award fees based on those entries. *Electro–Methods, Inc. v. Adolf Meller Co.*, 473 F. Supp. 2d 281, 305–06 (D. Conn. 2007).

Courts in this district, including this Court, have reduced fee awards when time entries do not refer to the specific matter worked on. While "preparation for hearing" is a permissible time entry not subject to reduction because it refers to a specific event and allows for a determination of the reasonableness of time spent, entries like "work on various items" and "work on documents" are too vague for a court to determine the reasonableness of time spent. *Electro–Methods*, 473 F. Supp. 2d at 305–06; *see also Rabin v. Wilson–Coker*, 425 F. Supp. 2d 269, 272–73 (D. Conn. 2006) (reducing the number of hours by five percent because the billing records contained entries such as "work on brief," even though most of the time entries were sufficiently detailed); *Mr. & Mrs. B. v. Weston Bd. of Educ.*, 34 F. Supp. 2d 777, 781 (D. Conn. 1999) ("Entries stating such vague references as 'review of file,' 'review of correspondence,' 'research,' 'conference with client,' and 'preparation of brief' do not provide an adequate basis upon which to evaluate the reasonableness of the services and hours expended on a given matter.").

Here, while the majority of Plaintiff's counsel's entries at least identify the general subject matter of the work performed, the Court notes that many, particularly in CD's invoices, are block-billed or impermissibly vague as to the tasks performed. The Court will therefore reduce CD's claimed fees by seven percent and BSW's by four percent; the Court does not believe a reduction in WD's claimed fees is warranted.

**2. Degree of Success**

17

Although the Supreme Court has "rejected a *per se* proportionality rule, i.e., proportionally linking the prevailing party's attorneys' fees to the degree of monetary success achieved, *City of Riverside v. Rivera*, 477 U.S. 561, 578 (1986), it has also held that "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained," *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Because "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount" where the "plaintiff has achieved only partial or limited success," courts may need to adjust the presumptively reasonable rate downward. *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Hensley*, 461 U.S. at 436).

In this case, although Plaintiff prevailed on some of its claims, its monetary success was quite limited due to its failure to prove willfulness and thus lost profits. To account for this limited success, the Court will reduce Plaintiff's claimed fees by ten percent.

### D. Awardable Costs[8]

#### 1. Expert Fees

Defendants contend that Plaintiff is not entitled to any expert fees. (Suppl. Opp'n at 11.) Plaintiff argues, however, that the Court has inherent authority to award such fees here because Fossil acted in bad faith in pursuing "objectively baseless and frivolous defenses concerning the validity of Romag's patent, for the sole purpose of trying to punish Romag for bringing its counterfeiting claims." (Reply at 22.)

While it is true that "a district court may invoke its inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute," such sanctions are

---

[8] Defendants object to Romag's claim of costs for $1,250 of phone calls from the Four Seasons Resort in Costa Rica and "$27,166.67 for a researcher in forecasting in Australia who assisted J. Scott Armstrong, Kesten C. Green." (Albert Decl. ¶ 22d.) However, as Romag no longer appears to seek an award of these costs, Defendants' arguments are not addressed here.

18

ADD-37

only appropriate where the Court finds fraud, abuse of the judicial process, or bad faith. *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008); *see also Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78–79 (2d Cir. 2000); *New York v. Solvent Chem. Co.*, 210 F.R.D. 462, 473–74 (W.D.N.Y. 2002).

Plaintiff claims that Defendants' conduct here warrants sanctions in the form of expert fees. In support of this argument, Plaintiff notes that it was forced to retain Dr. Schwarz to rebut the expert opinions—rejected outright by Judge Young on summary judgment—of Dr. Rice and Mr. Kucklick that Romag's patent was insufficiently definite. Indeed, Judge Young found Defendants' argument regarding indefiniteness so lacking in merit that he *sua sponte* granted Romag summary judgment on the issue of indefiniteness at the time he denied Defendants' own motion for summary judgment. (*See* Mem. & Order [Doc. # 260] at 56–58.) In light of Judge Young's ruling, this Court concludes that Defendants' indefiniteness defense was "entirely meritless" and was raised for "improper purposes," *Revson*, 221 F.3d at 79, and therefore Plaintiff is entitled to expert fees for Dr. Schwarz.

Plaintiff does not, however, offer compelling reasons for a finding of bad faith with respect to any other expert witness. That some defense witnesses who Plaintiff hired experts to rebut were not called at trial does not, without more, demonstrate bad faith on the part of Defendants. Plaintiff points to no further evidence of bad faith and the Court is aware of none. Thus, Plaintiff is awarded expert fees in the amount of **$54,877.54** for Dr. Schwarz's testimony.

### 2.  Taxable & Non-Taxable Costs

The Court has previously ruled that Plaintiff is entitled to taxable costs under CUTPA, but not non-taxable costs. (First Ruling on Mot. Att'ys' Fees at 13–15.) Defendants contend, and Plaintiff appears to agree, that of the $245,083.25 in costs originally sought by Romag, $15,511.98 are taxable under CUTPA. (*See* Suppl. Opp'n at 13; Ex. 3 to Schaefer Suppl. Decl.) However,

ADD-38

Plaintiff additionally contends that it is entitled to recover costs under Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1920.

Under Federal Rule of Civil Procedure 54(d)(1), "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." Allowable costs are defined by 28 U.S.C. § 1920 and include fees of the clerk and marshal, fees for printed or electronically recorded transcripts necessarily obtained for use in the case, fees and disbursements for printing and witnesses, fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case, docket fees, compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services.

The question here is whether Plaintiff may recover costs under both CUTPA and § 1920. Plaintiff offers no authority for the proposition that a federal court exercising supplementary jurisdiction over a state law claim may award costs under both state and federal law, and the Court concludes that it may not.[9] *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10 *Federal Practice and Procedure* § 2669 (2014) ("The award of costs is governed by federal law."); *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995) ("[I]t was error for the district court to use state procedure instead of federal procedure to determine the amount of costs."); *Conte v. Flota Mercante Del Estado*, 277 F.2d 664, 672 (2d Cir. 1960) ("[N]o authority is needed for the proposition that a court will tax ordinary court costs in accordance with its own practice rather than that of the state where the claim arose."); *Natale v. City of Hartford*, No. CIV. H-86-928 (AHN), 1989 WL 132542, at *7 n.10 (D. Conn. Sept. 12, 1989) ("The court notes that the additional fees sought under Connecticut statutory law, Conn. Gen. Stat. Section 52–257,

---

[9] To the extent this holding conflicts with the Court's holding in the First Ruling on Mot. Att'ys' Fees, that part of the prior ruling which conflicts is vacated.

20

ADD-39

shall be disallowed, as federal law (Section 1920) deals with the issue and therefore controls."); *Baker v. Power Sec. Corp.*, 174 F.R.D. 292, 294 (W.D.N.Y. 1997) ("Except in rare circumstances in which some important state interest is implicated . . . the awarding of costs in an action in federal court is controlled by federal law, specifically Rule 54 and 28 U.S.C. §§ 1821 and 1920."); *United States v. Bedford Assocs.*, 548 F. Supp. 748, 752 (S.D.N.Y. 1982) ("In the absence of such a specific contractual provision, federal law is controlling on the amount of reasonable disbursements and charges Bowery may recover."); *Vernon Lumber Corp. v. Harcen Const. Co.*, 61 F. Supp. 939, 941 (E.D.N.Y. 1945) (holding that federal law, not state law, controls award of costs); *Souto v. Int'l Freighting Corp.*, 19 F. Supp. 856, 856 (S.D.N.Y. 1937) (same).

As this case was heard in federal court, federal procedural rules apply, and Plaintiff is entitled to costs under § 1920, not under CUTPA. Turning then to the application of § 1920 here, Romag's claimed costs consist of: (1) court fees; (2) trial and hearing transcripts; (3) process server and marshal fees; (4) depositions and deposition transcription fees; (5) production; (6) translations; (7) copies of documents; (8) trial presentation services; and (9) handbag purchases. Each is discussed below.

### a. Court Fees and Trial/Hearing Transcripts

Plaintiff claims **$899** in court fees and **$8,741.25** in fees for trial/hearing transcripts, which are clearly taxable under 28 U.S.C. § 1920(1) and (2), respectively, and will therefore be awarded to Plaintiff.

### b. Process Server and Marshal Fees

Plaintiff next claims **$355** for process servers and certified copies and **$1,345.48** in marshal's fees. Both are covered by § 1920(1) and shall be awarded. *See U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 172 (2d Cir. 1996)

ADD-40

(holding that it is not an abuse of discretion for a district court to award fees for private process servers).

### c.  Depositions and Deposition Transcription Fees

Section 1920(2) permits the award of fees for "printed or electronically recorded transcripts necessarily obtained for use in the case." Plaintiff seeks $50,515.56 for deposition transcriptions. These fees are plainly covered by § 1920(2) and will be awarded with the exception of the fees for the transcription of Dr. Beutel's deposition for the reasons discussed above with respect to attorneys' fees. Plaintiff is therefore awarded **$50,226.56** for deposition transcriptions.

### d.  Production[10]

Among the costs claimed by Plaintiff is $858.51 for "production." The only bill Plaintiffs provide to substantiate this cost is for $848.79, and demonstrates that the sum was used to pay Xact Data Discovery for "B/W Blowbacks w/ slip sheets," i.e. for printing electronic documents, presumably for production to opposing counsel during discovery. "Printing copies (or blowbacks) . . . [is] the equivalent of photocopying," *Plantronics, Inc. v. Aliph, Inc.*, No. C 09-01714 (WHA) (LB), 2012 WL 6761576, at *12 (N.D. Cal. Oct. 23, 2012), and is taxable under § 1920(3) and (4). However, because Plaintiff has only produced an invoice for **$848.79**, that amount and not $858.51 will be awarded.

### e.  Translations

Plaintiff seeks an award of $1,064 for translations of certain documents, pursuant to § 1920(6). The award of translation costs are, however, foreclosed by the Supreme Court's 2012 decision in *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, in which the Court held that

---

[10] Defendants object to Plaintiff's claim of fees in connection with searching Fossil's back-up tapes (as discussed with regard to fees above). (Albert Decl. ¶ 13.) However, Plaintiff disclaims that it seeks such costs. (Reply at 8 n.3.)

22

ADD-41

"because the ordinary meaning of 'interpreter' is someone who translates orally from one language to another, we hold that the category 'compensation of interpreters' in § 1920(6) does not include costs for document translation." *Id.* at 2007. The Court thus declines to award Plaintiff fees for documents translations.

### f. Copies

Romag requests $26,331.73 for copies and $3,573.84 for "client copies." Relying on CUTPA, which allows costs "for copies of records used in evidence, bonds, recognizances and subpoenas," Defendants contend that only copies made prior to January 2014 are taxable because "it is unlikely tha[t] copies made in 2010–2013 would constitute 'copies of records used in evidence.'" (Suppl. Albert Decl. ¶ 19c.)

Under § 1920, however, costs for "printing," 28 U.S.C. § 1920(3), and for "making copies of any materials where the copies are necessarily obtained for use in the case," *id.* § 1920(4), are taxable, regardless of whether the copies were of records used in evidence. *See Merritt Meridian Const. Corp.*, 95 F.3d at 173 ("Photocopying costs may be recovered even though the underlying document was not admitted at trial."). Local Rule of Civil Procedure 54 clarifies though that "[c]osts for the convenience of counsel or" more than "one copy of documents admitted into evidence" "are not taxable unless otherwise directed by the Court." D. Conn. L. Civ. R. 54(c)(3).

Both BSW and CD submitted bills for copying costs. BSW's bill includes the following categories of items:

| Description | Cost |
|---|---|
| Tyco [printing of documents from tif file; printing of documents from CD] | $1054.38 |
| Copies of documents in Dallas | $324.53 |
| Tyco [copying of documents] | $1390.59 |
| Tyco [copying of exhibits] | $7320.66 |
| Tyco [copying of documents in notebooks] | $486.82 |

Because printing costs are covered by § 1920(3) without a showing of necessity, Plaintiff shall be awarded the **$1,054.38** it claims for printing. Plaintiff will also be awarded the **$324.53** of copying costs it seeks in relation to the depositions in Dallas. With regard to the copies of exhibits, Plaintiff's invoices reveal that it expended $5,583.38 on obtaining seven copies of each exhibit and $670.56 on obtaining four copies of each exhibit. Because the Court generally requests a courtesy copy of each exhibit from counsel, the Court will permit the costs of three copies (one plus the original for the Court, one for counsel, and one for opposing counsel), but Plaintiff has offered no explanation for why four or seven copies were necessary. Therefore, the Court will award **$2,895.80** for copies of exhibits (3/7 of $5,583.38 + 3/4 of $670.56).

The Court declines to award the remaining costs requested by BSW for copying, however, because BSW did not "itemize those costs or explain why all those copies were necessary." *Merritt Meridian Const. Corp.*, 95 F.3d at 173. Neither Romag's charts nor its invoices identify which documents were copied and for what purpose. "Although the prevailing party is not required to submit a bill of costs so detailed as to make it impossible economically to recover photocopying costs, where a court is unable to determine whether the copies in question were reasonably necessary for use in the case, the claim for costs should be denied." *Moriarty v. Glueckert Funeral Home, Ltd.*, No. 95 C 2848, 1999 WL 162792, at *3 (N.D. Ill. Mar. 11, 1999) (internal quotation marks and citations omitted); *see Goodwall Const. Co. v. Beers Const. Co.*, 824 F. Supp. 1044, 1065 (N.D. Ga. 1992) *aff'd and remanded*, 991 F.2d 751 (Fed. Cir. 1993) ("The party seeking to recover photocopy costs must come forward with evidence showing the nature of the documents copied including how they were used or intended to be used in the case."). BSW additionally seeks $3,573.84 for "client copies," but it neither identifies what this means nor provides any authority for the proposition that client copies are taxable under § 1920. As such, these expenses will not be awarded. *See Barrington v. Lockheed Martin Corp.*, No. 6:05 CV 1601

24

ADD-43

(ORL) (KRS), 2007 WL 1303032, at *5 (M.D. Fla. May 3, 2007) ("Many of the copies were for the client. Such copies are not taxable.").

Romag additionally requests costs in the amount of $15,754.75 for photocopies made by CD. However, CD offers no description whatsoever of the documents that were copied nor any explanation for why such copies were reasonably necessary for use in the case. Nor does CD submit any actual invoices or receipts to support its claim for $15,754.75. Nonetheless, Defendants have conceded that at least **$5,632.00** was likely reasonably necessary for copies, and the Court will therefore award CD copying costs in this amount.

###### g.  Trial Presentation Services

Plaintiff requests an award of $31,500.86 for "trial presentation services." These services include: the fees of IT specialists who helped to develop and present visual exhibits at trial, the rental cost of audiovisual equipment, the fees of a photographer, and the fees of a consultant for visual services. Under § 1920(4), "fees for exemplification" are taxable if "necessarily obtained for use in the case."

Although "[c]ourts in other circuits disagree about whether the reference in 28 U.S.C. § 1920(4) to 'exemplification' includes demonstrative aids," *In re Omeprazole Patent Litig.*, No. 00 CIV. 4541 (BSJ), 2012 WL 5427791, at *7 (S.D.N.Y. Nov. 7, 2012) (comparing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000) *with Arcadian Fertilizer, L .P. v. MPW Indus. Servs., Inc.*, 249 F.3d 1293, 1297 (11th Cir. 2001)), several courts in this Circuit have found that it does, *see id.*; *Farberware Licensing Co. LLC v. Meyer Mktg. Co.*, No. 09 CIV. 2570 (HB), 2009 WL 5173787, at *8 (S.D.N.Y. Dec. 30, 2009) *aff'd*, 428 F. App'x 97 (2d Cir. 2011); *DiBella v. Hopkins*, 407 F. Supp. 2d 537, 540 (S.D.N.Y. 2005).

As then-district court Judge Chin explained in *DiBella*,

the use of technology to improve the presentation of information to the jury and/or to the bench should be supported. Computers, computer graphics,

25

ADD-44

digitized documents, and other technological advancements have become important tools of the modern-day trial lawyer. As long as the cost is reasonable and the devices aid in the efficient and effective presentation of evidence, a prevailing party should be allowed to recover their expense.

407 F. Supp. 2d at 540 (internal quotation marks and citation omitted); *see also Farberware*, 2009 WL 5173787, at *8 (same).

Because Romag's visual presentation of exhibits was necessary to its presentation of its case, the Court will allow the costs of the equipment rental, the photographer, and the visual services consultant. The Court will additionally award the majority of the IT specialists' fees, but it will not award that portion of the fees that covered travel and incidental expenses, totaling $2,468.22. Thus, Romag shall be awarded trial presentation services costs in the amount of **$29,032.64**.

### h. Handbag Purchases

Romag's final claim of costs is for $10,203.74 in handbags, of which four were put into evidence at trial.[11] Romag contends that this expense is taxable as an exemplification. The Court is not persuaded that it was "reasonably necessary" for Romag to purchase over $10,000 of handbags in order to present its case, particularly in light of the fact that only four of the bags were put into evidence. The Court will award **$400** for the cost of the handbags that were presented as exhibits at trial.

---

[11] Defendants incorrectly assert that Plaintiff seeks $16,838.20 for handbags. (*See* Opp'n at 39).

**E. Summary**

**1. Fees**

At the hourly rates determined by the Court, BSW's claimed fee is $1,076,967.50, CD's claimed fee is $1,811,789.50, and WD's claimed fee is $95,081.00. Adding their legal research costs, BSW's claimed fee is $1,087,674.39; CD's is $1,837,208.49; and WD's is $96,092.12.

To reflect the Court's findings above, these sums are reduced by these amounts:

| | BSW | CD | WD |
|---|---|---|---|
| **Unsuccessful Claims** | $79,152.34 | $110,402.75 | $29,868.30 |
| **a. Claims against Retailers** | $6,757.50 | $21,279.50 | 0 |
| **b. Motions to Amend** | $19,111.40 | $48,194.30 | $12,553.20 |
| **c. TRO** | $22,105.31 | $13,833.75 | 0 |
| **d. Lanham Act Profits** | $31,178.13 | $27,095.20 | $17,315.10 |
| **Discovery of Email Backup Tapes** | 0 | 0 | 0 |
| **Work Done by Partners that Could have been Done by Associates** | 0 | 0 | 0 |
| **Unrelated and Frivolous Work** | $5023.75 | $4069 | 0 |
| | | | |
| **Total** | $84,176.09 | $114,471.75 | $29,868.30 |

Deducting the amounts listed in "Total" above from each firm's claimed fee yields the following presumptively reasonable fees:

BSW: $1,003,498.30 ($1,087,674.39– $84,176.09)

CD: $1,722,736.74 ($1,837,208.49– $114,471.75)

WD: $66,223.82 ($96,092.12– $29,868.30)

BSW's fee is further reduced by 4% and CD's by 7% to account for inappropriate billing, yielding the following fees: BSW: $963,358.37; CD: $1,602,145.17; WD: $66,223.82. Each of these fees is

27

ADD-46

further reduced by 10% to account for Plaintiff's limited success. Accordingly, Plaintiff is awarded the following fees: <u>BSW</u>: $867,022.53; <u>CD</u>: $1,441,870.65; and <u>WD</u>: $59,601.44, for a total of **$2,368,494.62.**

### 2. Costs

The Court's award of costs, discussed above, is summarized here:

| Description | Cost |
|---|---|
| Expert Fees | $54,877.54 |
| Marshal's Fees & Process-Server Fees | $1,700.48 |
| Court Fees | $899.00 |
| Trial/Hearing Transcripts | $8,741.25 |
| Production | $848.79 |
| Printing | $1,054.38 |
| Copies | $8,852.33 |
| Trial Presentation Services | $29,032.64 |
| Handbags | $400.00 |
| | |
| **Total** | **$156,632.97** |

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion [Doc. # 450] for Attorneys' Fees is GRANTED with modifications. The Court awards $2,525,127.59 in attorneys' fees and costs. To the extent the Court's holding that Plaintiff may not recover costs under CUTPA conflicts with

28

the First Ruling on Motion for Attorney's Fees [Doc. # 481], that part of the prior ruling which conflicts is VACATED.


IT IS SO ORDERED.

/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 30th day of September, 2015.

ADD-48

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ROMAG FASTENERS, INC.,<br>*Plaintiff,*<br>*v.*<br>FOSSIL, INC., FOSSIL STORES I, INC., MACY'S,<br>INC., and MACY'S RETAIL HOLDINGS, INC.,<br>*Defendants.* | Civil No. 3:10cv1827 (JBA)<br><br>March 28, 2016 |

**RULING ON PLAINTIFF'S SUPPLEMENTAL MOTION FOR ATTORNEYS' FEES**

Following this Court's ruling granting with modification Plaintiff's Motion for Attorneys' Fees, Plaintiff moves [Doc. # 508] for fees and costs expended in litigating the motion for attorneys' fees and other post-trial motions. For the reasons that follow, Plaintiff's motion is granted with modification.

I.  **Legal Standard**

In determining a reasonable attorney's fee under CUTPA or the Patent Act, courts begin by assessing what hourly rate a reasonable client would be willing to pay, keeping in mind the factors enumerated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).[1] *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 493 F.3d 110, 118 (2d Cir. 2007) ("*Arbor Hill I*"), *amended on other grounds by* 522 F.3d 182, 184 (2d Cir.

---

[1] The *Johnson* factors include (1) the time and labor required by an attorney; (2) the novelty and difficulty of the questions presented by the litigation; (3) the level of skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney because of acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

2008) ("*Arbor Hill II*") (determining reasonable fees in the context of 42 U.S.C. § 1988); *see Emerald Investments, LLC v. Porter Bridge Loan Co.*, No. CIV.A. 3:05-CV-1598J, 2007 WL 1834507, at *5 (D. Conn. June 25, 2007) (applying the *Arbor Hill* approach in a CUTPA case to calculate the presumptively reasonable fee); *City of Burlington v. Dague*, 505 U.S. 557, 561–62 (1992) (holding that because many federal fee-shifting statutes use the language "reasonable attorney fees," "case law construing what is 'reasonable' applies uniformly to all of them"). Courts "then use that reasonable hourly rate to calculate . . . the 'presumptively reasonable fee.'" *Arbor Hill I*, 493 F.3d at 118. Once the court has determined the "presumptively reasonable fee," it "may still adjust that amount" upward or downward "based on relevant factors specific to the instant case," such as the level of success the plaintiff attained.[2] *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, No. 3:03-CV-599 (CFD), 2011 WL 721582, at *3 (D. Conn. Feb. 22, 2011).

## II. Discussion

Plaintiff, who was represented by three law firms in this case, seeks fees totaling $395,556.25[3] ($176,050.00[4] for Brenner, Saltzman & Wallman LLP ("BSW"), $211,541.25[5] for

---

[2] However, in accord with the specific statutory language in CUTPA, for purposes of determining fees under CUTPA, "the question whether plaintiff achieved a 'level of success' . . . cannot be answered . . . with reference to the dollar recovery as it is in other contexts." *Bristol Tech., Inc. v. Microsoft Corp.*, 127 F. Supp. 2d 64, 68 (D. Conn. 2000).

[3] This figure includes the $20,000 Plaintiff seeks prospectively to cover its work on the reply brief related to the motion at issue here. (*See* Mem. Suppl. Mot. Fees [Doc. # 508] at 9.)

[4] This figure includes the $10,000 BSW estimates it will charge for its work on the reply brief related to the motion at issue here. (*See* Schaefer Suppl. Decl. [Doc. # 509] ¶ 11.)

[5] This figure includes the $10,000 CD estimates it will charge for its work on the reply brief related to the motion at issue here. (*See* Sayour Decl. [Doc. # 510] ¶ 9.)

2

Cooper & Dunham LLP ("CD"), and $7,965.00 for Wiggin and Dana LLP ("WD")), expert fees totaling $4,172, and costs totaling $13,328.96. (Suppl. Mot. for Fees at 1–3, 9.)

Defendants do not object to the hourly rates sought by Plaintiff's counsel. Instead, they argue: (1) the hours claimed by Plaintiff's counsel are unreasonably high; and (2) the presumptively reasonable fee should be reduced to account for Plaintiff's limited success.

## A. Reasonableness of Hours Requested

Defendants contend that Plaintiff should not recover fees for several unsuccessful motions, and that the number of hours for which Plaintiff seeks compensation is unreasonably high. They seek a 20% reduction in the number of hours claimed.

Specifically, Defendants assert that Plaintiff should not be awarded fees for time spent on its unsuccessful motion to compel production of Defendants' billing records and the related subpoenas, nor should it be awarded fees for time spent on its opposition to Defendants' Rule 50/59 motion (although the Court denied the motion without prejudice) because that motion related to the issue of profits. (Opp'n [Doc. # 517] at 12, 13.) Plaintiff responds that "the fact that the Court, in its discretion, concluded that it did not need Defendants' billing records to decide the issues before it does not mean that the effort to obtain those records was unjustified," and with respect to the Rule 50/59 motion, Plaintiff should be able to recover its fees because it succeeded in "persuad[ing] the Court to deny Fossil the relief it requested." (Reply [Doc. # 518] at 6.)

The arguments of both parties have merit. Plaintiff's motion to compel was unquestionably unsuccessful, and because that work is separable from other, compensable work, a reduction is appropriate. However, no reduction is appropriate with respect to Plaintiff's work in opposing Defendants' Rule 50/59 motion because, as Plaintiff notes, it succeeded in that

3

endeavor. Based on a review of Plaintiff's billing records, the Court concludes that reduction of

**$22,666.50** ($14,625 from BSW and $8,041.50 from CD; WD does not appear to have worked on

these issues) for work spent on the subpoenas and motion to compel is appropriate.

The Court does not, however, find any demonstrated merit in Defendants' contention

that Plaintiff has claimed an unreasonably high number of hours for work on its fee petition,

which required organizing and sorting through invoices spanning four years, a mammoth task in

any case, but particularly here, given the level of contentiousness that has pervaded this litigation.

Therefore, no further reduction will be taken from Plaintiff's claimed hours.

### B.  Adjustments

Defendants next seek a reduction of 1/3 to account for Plaintiff's limited success in their

fee application. Although the Supreme Court has "rejected a *per se* proportionality rule, i.e.,

proportionally linking the prevailing party's attorneys' fees to the degree of monetary success

achieved, *City of Riverside v. Rivera*, 477 U.S. 561, 578 (1986), it has also held that "the most

critical factor" in determining the reasonableness of a fee award "is the degree of success

obtained," *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Because "the product of hours reasonably

expended on the litigation as a whole times a reasonable hourly rate may be an excessive

amount" where the "plaintiff has achieved only partial or limited success," courts may need to

adjust the presumptively reasonable rate downward. *Barfield v. N.Y. City Health and Hosps.

Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Hensley*, 461 U.S. at 436).

Here, the parties dispute how successful Plaintiff's fee application was. Defendants,

summing the fees and costs Plaintiff sought, contend that Plaintiff was awarded only 67% of the

amount sought. (Opp'n at 8, 10–11.) Plaintiff responds that because 96% of the amount it now

seeks is for fees and only 4% is for costs, "any apples-to-apples comparison to Romag's Initial

4

ADD-52

Application must also focus on attorneys' fees." (Reply at 2.) Because Plaintiff was awarded 80% of the fees it requested initially, no more than a 20% reduction would be appropriate here.[6] (*Id.*)

Plaintiff is surely correct that "[a] fee award is not a reflection of a blow-by-blow scorecard of every argument made during the course of a proceeding." (*Id.* at 3.) Nonetheless, the amount awarded to a party seeking fees can serve as a rough proxy of the level of success of that petition. *See Yurman Designs, Inc. v. PAJ, Inc.*, No. 98 CIV. 8697 (RWS), 2001 WL 797474, at *4 (S.D.N.Y. July 12, 2001) (reducing supplemental fee award by 80% to account for the fact that the party was awarded only 20% of the fees and costs it sought in its initial fee application). Plaintiff here was awarded 79.2% of the fees it initially sought and 19.9% of the costs it sought. However, the majority of the work that went into the petition and the major focus of the parties' briefing was on the fees portion of the petition. The Court will therefore reduce Plaintiff's requested award by **25%** to account for its limited degree of success.[7]

### C. Awardable Costs

Defendants object to only one category of claimed costs: expert fees. Plaintiff seeks $4,172 for expert witness Jeremy Mellitz, who opined on the issue of the reasonableness of the rates charged by Plaintiff's counsel. (Pl.'s Suppl. Mot. at 3; *see* Ex. F to Schaefer Suppl. Decl.) However, as Defendants note, the only expert fees this Court awarded in the initial application was pursuant to the Court's inherent authority to impose sanctions in the form of reasonable expert

---

[6] Plaintiff additionally argues that its "rate of financial success on its Initial Application is not relevant to determining the amount of attorneys' fees that should be awarded" here. (Reply at 3.)

[7] The Court is aware that not all of the fees claimed here pertain to work on the initial application. However, the majority (76%) of the fees sought ($298,831.41 of $395,556.25) are for work on that application, and the Court has taken this into consideration in reaching the 25% figure.

fees. No such sanctions are appropriate here, and Plaintiff puts forth no other basis for the award of expert fees.

As the Supreme Court held in *Henkel v. Chicago St. P., M & O Ry.* long ago, "[s]pecific provision as to the amounts payable and taxable as witness fees was made by Congress . . . . [A]dditional amounts paid as compensation, or fees, to expert witnesses cannot be allowed or taxed as costs in cases in the federal courts." 284 U.S. 444, 446 (1932). Under 28 U.S.C. § 1920, allowable costs include fees and disbursements for witnesses and compensation of court appointed experts.

As Mr. Mellitz was not a court appointed expert, he could only potentially recover fees as a witness, but 28 U.S.C. § 1821 limits such fees to witnesses "in attendance at any court of the United States . . . or before any person authorized to take his deposition." *See L & W Supply Corp. v. Acuity*, 475 F.3d 737, 741 (6th Cir. 2007) ("[E]xpert witness fees may not be taxed as costs at a court's discretion under Rule 54(d) because § 1920 does not provide for them. Therefore, Acuity is not entitled to recover expert witness fees (i.e., the hourly rate charged for the expert's time and services). It is, however, entitled as a matter of course to recover the witness costs provided for in § 1821, which are largely compensatory in nature."). "[T]he expert witness involved [here] did not appear in Court, except by an affidavit" attached to Plaintiff's fee petition, and he did not attend a deposition hearing. *Mikel v. Kerr*, 64 F.R.D. 93, 95 (E.D. Okla. 1973) *aff'd*, 499 F.2d 1178 (10th Cir. 1974). As such, Plaintiff is not entitled to costs for Mr. Mellitz, and **$4,172** will be deducted from Plaintiff's claimed costs.

6

### D. Summary

BSW's claimed fee is $176,050.00, CD's claimed fee is $211,541.25, and WD's claimed fee is $7,965.00. Adding their legal research costs,[8] BSW's claimed fee is $179,621.23; CD's is $219,654.30; and WD's is $8,534.19. For the reasons discussed above, BSW's fee is reduced by $14,625 and CD's fee is reduced by $8,041.50, yielding the following presumptively reasonable fees: BSW: $164,996.23; CD: $211,612.80; WD: $8,534.19.

Each of these fees is further reduced by 25% to account for Plaintiff's limited success. Accordingly, Plaintiff is awarded the following fees: BSW: $123,747.17; CD: $158,709.60; and WD: $6,400.64, for a total of **$288,857.42**. In addition, the Court awards **$1,075.49** in costs.[9]

### III. Conclusion

For the foregoing reasons, Plaintiff's Supplemental Motion [Doc. # 508] for Attorneys' Fees is GRANTED with modification. The Court awards **$289,932.91** in attorneys' fees and costs.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of March, 2016.

---

[8] The Court is cognizant that the Local Rules of Civil Procedure proscribe the award of legal research fees as costs, D. Conn. L. Civ. R. 54(c)(7), but the fees are awarded here as part of the award of attorney's fees, not as taxable costs, as permitted under *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004).

[9] As explained above, the costs of electronic research, totaling $12,253.47, were awarded as part of the fee award. The remaining costs sought were awarded as costs, less the $4,172 claimed in expert fees.

ADD-55

## Federal Rules of Appellate Procedure Form 6.
## Certificate of Compliance With Rule 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒    This brief contains 16,176 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), **or**

☐    This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

☒    This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point type Times New Roman type style, **or**

☐    This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: June 20, 2016                    /s/Jonathan M. Freiman
                                        Jonathan M. Freiman
                                        WIGGIN AND DANA LLP
                                        One Century Tower
                                        P.O. Box 1832
                                        New Haven, CT 06508-1832
                                        (203) 498-4400
                                        (203) 782-2889 (fax)
                                        jfreiman@wiggin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 23, 2016, the foregoing Corrected Brief of

Plaintiff/Appellee/Cross-Appellant Romag Fasteners, Inc. was filed with the Court

and served on the following counsel electronically through the Court's CM/ECF

System. Parties may access this filing through the Court's CM/ECF System.

Jeffrey E. Dupler
Gibney Anthony & Flaherty, LLP
665 Fifth Avenue
New York, NY 10022

Lauren Albert
The Law Offices of Lauren S. Albert
830 Third Avenue, 5th Floor
New York, NY 10022

Lawrence Brocchini
Reavis Parent Lehrer LLP
41 Madison. 41st Floor
New York, NY 10010

William J. Cass
Nicholas Geiger
Cantor Colburn LLP
20 Church Street, 22nd Floor
Hartford, CT 06103

<div align="right">

/s/Jonathan M. Freiman
Jonathan M. Freiman
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
jfreiman@wiggin.com

</div>